ACCEPTED
03-15-00317-CV
7147667
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/29/2015 2:23:28 PM
JEFFREY D. KYLE
CLERK

CAUSE NO. 03-15-00317-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/29/2015 2:23:28 PM
JEFFREY D. KYLE
Clerk

**TERRY RANDALL**
**Appellant**

**vs.**

**HERBERT WALKER D/B/A, WALKER WATER WELLS AND**
**WALKER WATER WELL SERVICES, LLC**
**Appellees**

From Cause No. 423-2441
In the 423rd Judicial District Court
Bastrop County, Texas

**APPELLANT TERRY RANDALL'S BRIEF**

S. Cory Sells
State Bar No. 24075525
Craig Welscher
State Bar No. 21167200
The Welscher Law Firm, P.C.
1111 North Loop West, Suite 702
Houston, Texas 77008
(713) 862-0800 – Telephone
(713) 862-4003 – Facsimile
Email: csells@welscherlaw.com
Attorneys for Appellant

# IDENTITY OF PARTIES AND COUNSEL

**Appellant**

Terry Randall

**Appellant's Trial and Appeal Counsel**

S. Cory Sells
SBN: 24075525
Craig Welscher
SBN: 21167200
The Welscher Law Firm, P.C.
1111 N. Loop West, Suite 702
Houston, Texas 77008
Telephone: (713) 862-0800
Facsimile: (713) 862-4003
Email: csells@welscherlaw.com

**Appellee**

Herbert Walker d/b/a
Walker Water Wells and
Walker Water Well Services, LLC

**Appellees' Trial Counsel**

Alex Metcalf
SBN: 24058000
807 Pecan Street
Bastrop, Texas 78602
(512) 303-6963 – Telephone
(512) 303-6766 – Facsimile
Email: alex@lostpineslawyer.com
Attorney for Appellant

# TABLE OF CONTENTS

PAGE

Identity of Counsel and Parties.................................................................................ii

Table of Contents.....................................................................................................iii

Index of Authorities…………......................................................................................vii

Statement of the Case................................................................................................1

Issues Presented…………..........................................................................................2

Statement of Facts…..................................................................................................3

    A.     Oral Agreement of Drilling Wells in Exchange for Drilling Rig........3

    B.     Breach of the Oral Agreement…...........................................................5

        1.     The First Well Produced Sandy, Orange Water………………..5

        2.     The Second Well Produced Sandy Water………….…….…….5

        3.     The Third Well Produced Sandy and "Blackish" Water………6

        4.     Randall Kept His End of the Agreement……………………..6

    C.     Randall was Damaged by Walker's Breach……………..…………6

    D.     Jury Verdict for Randall Disregarded……………...……………7

Summary of the Argument.........................................................................................8

Argument...................................................................................................................9

    *A. THE NO EVIDENCE STANDARD FOR ATTACKING ADVERSE FINDINGS BY A JURY*…9

    *B. QUESTION NUMBER ONE: EXISTENCE AND TERMS OF THE AGREEMENT*………....10

1.  Disregarded for No Supporting Evidence…..............................................10

2.  Offer: Randall Testified of the Terms Negotiated Between the Parties...................................................................................................11

3.  Acceptance: Walker Testified that He Drilled the Wells and Was Responsible for the Correct Drilling of the Wells……………….............12

4.  Part Performance Under an Agreement May Remove Uncertainty and Establish that a Contract is Enforceable…..............................................14

C.  *QUESTION NUMBER TWO: BREACH BY WALKER*....................................................17

1.  Disregarded for No Supporting Evidence....................................................17

2.  Expert Testified the Well Water was Harmful to Humans and Animals and Full of Sand …………………………………………...................17

D.  *QUESTION NUMBER THREE: DAMAGES*………………………….................18

1.  Disregarded for No Supporting Evidence…..............................................18

2.   $89,596.06 Paid for Worthless Wells…………...………..................18

3.  Walker's Attorney Stated the Market Value    of    the    Wells    was $22,000…………………………………………………………………19

E.  *QUESTION NUMBER FOUR: ATTORNEY'S FEES*………………….......................20

1.  Disregarded for No Supporting Evidence................................................20

2.  Uncontested, Reasonable Testimony Established the Attorney's fees as a Matter of Law…………………………………………………...21

3.  Evidence was Put Before the Jury of $30,845.00 in Reasonable Attorney's fees…………………………………………………23

*F. REQUEST TO FIND A JUDICIAL ADMISSION: RAISED AS TO QUESTION ONE AND TWO*……………………………………………………………...……..23

    1. Herbert Cannot Rely on a Judicial Admission that He Failed to Protect…………………………………………………………..24

    2. Contradictory Testimony is a Quasi-Admission for the Fact Finder to Resolve …………………………………………………...25

*G. WALKER WATER WELLS DID NOT FILE ANY POST-TRIAL MOTION*…...……..……27

Conclusion.................................................................................27

Prayer.......................................................................................28

Certificate of Compliance...........................................................28

Certificate of Support................................................................29

Certificate of Service.................................................................29

Appendix.....................................................................................a

1. ***Clerk's Record***

    a. Charge of the Court

    b. Defendant's Motion For Judgment Non Obstante Veredicto

    c. Defendant Herbert Walker's Post Verdict Brief

    d. Judgment

2. ***Reporter's Record***

    a. *Volume 3*

        i. Excerpts of Examination of Terry Randall

 ii. Excerpts of Examination of Herbert Walker

 iii. Excerpts of Examination of Tom Frist

 iv. Excerpts of Examination of S. Cory Sells

**b.  *Volume 4***

 i. Objections By Mr. Metcalf, Attorney for Appellees on Submission of Jury Question One and Two

 ii. Excerpts of Closing Statements by Mr. Metcalf

**c.  *Volume 7***

 i. Plaintiffs' Exhibit 2

 ii. Plaintiffs' Exhibit 4

 iii. Plaintiffs' Exhibit 8

# INDEX OF AUTHORITIES

*TEXAS CASE LAW:*

*Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)……………………………...23

*Brown v. Bank of Galveston*, 930 S.W.2d 140, 145 (Tex. App.- Houston [14th Dist.] 1996), aff'd, 963 S.W.2d 511 (Tex. 1998)…………………………………21

*Cale's Clean Scene Carwash, Inc. v. Hubbard*, 76 S.W.3d 784, 786 (Tex. App.-Houston [14th Dist.] 2002, no pet.)……………………………………………….23

*City of Keller v. Wilson*, 168 S.W.3d 802, 810, 819, 822, 827 (Tex. 2005)…….9

*Crisp Analytical Lab, L.L.C., v. Jakalam Props., Ltd*, 422 S.W.3d 85, 88 (Tex. App.—Dallas 2014, pet. denied)………………………………………………….16

*Croucher v. Croucher*, 660 S.W.2d 55, 58,(Tex. 1983)…………………………....9

*Cullins v. Foster*, 171 S.W.3d 521, 538-39 (Tex. App.- Houston [14th Dist.] 2005, pet. denied)………………………………………………………………..21

*El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761-62 (Tex. 2012)………………..22

*Fiduciary Fin. Servs. of Sw. Inc. v. Corilant Fin., L.P.,* 376 S.W.3d 253, 256 (Tex. App.—Dallas 2012, pet. denied)………………………………………………….14

*Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 847 (Tex. 2000)…………………………………………………………………………….14

*Griffin v. Superior Insurance Co*., 338 S.W.2d 415, 419 (Tex.1960)…………….26

*Harris Cnty. v. Hall*, 141 Tex. 388, 172 S.W.2d 691, 694-95 (Tex. 1943)……….26

*Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762, 765 (Tex. 1987)……24-25

*Komet v. Graves*, 40 S.W.3d 596, 601 (Tex. App.-San Antonio 2001, no pet.)……………………………………………………………………………..15

*Learners Online, Inc. v. Dallas Indep. Sch. Dist.,* 333 S.W.3d 636, 643 (Tex. App.--Dallas 2009, no pet.)……………………………………………………..14

*Lofton v. Texas Brine Corp.*, 777 S.W.2d 384, 386 (Tex. 1989)…………………..21

*Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998)………….9

*Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989)……………………………...24

*Midland Western Bldg., L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 739 (Tex. 2009)…………………………………………………...22

*Miller v. Bock Laundry Machine Co.*, 568 S.W.2d 648, 652 (Tex. 1977)………..27

*Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980)……………………………………………………………………………..25, 26

*Palestine Water Well Servs., Inc. v. Vance Sand & Rock, Inc.*, 188 S.W.3d 321, 324-27 (Tex. App.—Tyler 2006, no pet.)…………………………………..15, 18, 19

*Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990)......21

*Regal Fin. Co., Ltd. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex.2012)…13

*Rosenblatt v. Freedom Life Ins. Co. of Am.,* 240 S.W.3d 315, 323 (Tex. App.-Houston [1st Dist.] 2007)……………………………………………………...…..22

*Sadeghi v. Gang*, 270 S.W.3d 773, 776 (Tex. App.—Dallas 2008, no pet.)……………………………………………………………………………..15

*Schlager v. Clements*, 939 S.W.2d 183, 193 (Tex. App.- Houston [14th Dist.] 1996, writ denied)………………………………………………………………..22

*Smith v. Patrick W.Y. Yam Trust*, 296 S.W.3d 545, 546 (Tex. 2009)……………..23

*TX Far West, Ltd. v. Tex. Invs. Mgmt.*, 127 S.W.3d 295, 308 (Tex. App.—Austin 2004 no pet.)……………………………………………………………………26

*United States Fidelity & Guaranty Co. v. Carr*, 242 S.W.2d 224, 229 (Tex.Civ.App.-San Antonio 1951, writ refused n.r.e.)…………………………..27

## STATEMENT OF THE CASE

The Jury returned a verdict in favor of Plaintiff and Appellant herein, Terry Randall ("Randall") against Defendants and Appellees, Herbert Walker d/b/a Walker Water Wells ("Herbert") and Walker Water Well Services, LLC, ("WWW" or jointly "Walker"), for the breach of an oral contract for the drilling of three water wells by Walker on Randall's property. (CR: 699-707). Trial Court granted Herbert's Motion for Judgment No Obstante Veridicto, dismissing Randall's claims as to both Herbert and Walker and ordering that Randall "take nothing as a result of this suit." (CR 739). This appeal followed.

## **ISSUE PRESENTED**

1. Was there sufficient evidence presented at trial to support the Jury's verdict.

**A.     Oral Agreement of Drilling Wells in Exchange for Drilling Rig**

Randall entered into an oral agreement with Walker for the drilling of three good water wells on Randall's property. (R.R. Vol. 3, at p. 60:8-61:24; and 115:15-22). Randall testified that Walker agreed to drill Randall three good wells in consideration for the title for the drilling rig owned by Randall. (*Id*; R.R. Vol. 3, at p. 179:25-180:20). Randall was to pay the expenses and Walker was to use Randall's drilling rig to drill the wells. (R.R. Vol. 3, at p. 61:22-24). On cross examination, Randall discussed other terms which were included by him and Walker through the ongoing negotiations during the work of drilling the three wells. (R.R. Vol. 3, at p. 119:4-19). These other terms included:

a.     Walker would drill the wells to two-hundred and fifty feet deep (R.R. Vol. 3, at p. 119:4-14; 121:6-14);

b.     Walker could use Randall's drilling rig to drill the wells (R.R. Vol. 3, at p. 179:25-180:17);

b.     Walker would set the tanks and pumps in the wells (R.R. Vol. 3, at p. 120:19-121:5); and

c.     The wells would produce good water (R.R. Vol. 3, at p. 121:6-14), which was defined as potable water. (R.R. Vol. 3, at p. 117:10-14).

Randall testified that these terms were all agreed to by Walker. (R.R. Vol. 3,

at p. 60:8-61:7; 115:15-22; and 123:6-14;). The jury saw four color photos showing the finished wells with tanks on slabs of concrete. (R.R. Vol. 7, at p. 59,60, 62, and 66).

Walker testified that:

1) he operated the drilling rig on Randall's property (R.R. Vol. 3, at p. 170:16-18);

2) he and his sons were responsible for the correct drilling of the three wells (R.R. Vol. 3, at p. 181:6-10);

3) he filled out well reports for the three wells, listing himself as the licensed driller (R.R. Vol. 3, at p. 170:7-15); and

4) the reports were filed with the State of Texas. (R.R. Vol. 3, at p. 170:7-15).

But, Walker denied that he and Randall had an agreement to drill the wells. (R.R. Vol. 3, at p. 166:4-19).

Randall testified that he and Walker had a prior history of oral contracts in which payment was then made to "Walker Water Well Service" for work Walker performed for Randall. (R.R. Vol. 3, at p. 58:4-5). The check showing the course of dealings between Randall and Walker was admitted as evidence in the trial. (R.R. Vol. 7, at p. 5).

4

## B. Breach of the Oral Agreement

### 1. The First Well Produced Sandy Orange Water

Randall testified that the first of the three wells was drilled by Walker and his two sons, Adam and Thomas Walker, while Randall was out of town. (R.R. Vol. 3, at p. 64:4-13). Walker failed to reach 250 feet with the first well. (R.R. Vol. 3, at p. 64:13-14).

Randall described the water quality of the first well as being "terrible." (R.R. Vol. 3, at p. 65:1-21). The water from the first well was orange and full of sand and began to ruin Randall's plumbing fixtures. *Id*. Walker stated that he could not contradict Randall's testimony as to the water quality of the first well. (R.R. Vol. 3, at p. 170:24-171:6).

Randall's expert witness as to water well drilling practices and water well quality, Thomas Frist ("Frist"), opined that the water from the first well was full of iron, harmful to plants, animals and humans, and non-potable. (R.R. Vol. 3, at p. 186:10-16 and 195:21-24).

### 2. The Second Well Produced Sandy Water

The second well was drilled to only two hundred and thirty feet, again falling short of the agreed 250 feet. (R.R. Vol. 3, at p. 66:22-25). Randall testified that the water produced was full of sand. (R.R. Vol. 3, at p. 67:21-68:3). The sand was so bad it destroyed the first water pump. *Id*. Frist also testified that he found

5

sand in the water from well two. (R.R. Vol. 3, at p. 187:2-8). In Frist's expert opinion, there should not be sand in the well water. *Id.*

### 3. The Third Well Produced Sandy and "Blackish" Water

Randall testified that the water coming from the third well was sandy, dirty, and blackish. (R.R. Vol. 3, at p. 69:18-70:6). Randall recalled that if the water sat, it would pump out stinky, nasty water with a black residue. *Id.* He asserted that this was not good water. *Id.* Frist testified that the water produced by well number three contained a level of sand not contained in good water. (R.R. Vol. 3, at p. 186:2-8).

### 4. Randall Kept His End of the Agreement

Herbert testified that he used Randall's drilling rig on Randall's property. (R.R. Vol. 3, at p. 180:10-20). Herbert also testified that the drilling rig, including its title, was transferred in exchange for the drilling of the wells. *Id.* Randall testified that he spent $9,596.06 on the expenses for the construction of the three wells. (R.R. Vol. 3, at p. 113:15-21).

## C.     Randall was Damaged by Walker's Breach

Randall testified that the wells drilled for him by Walker were of no value. (R.R. Vol. 3, at p. 71:6-13). He also testified that the market value of the title of the drilling rig Randall transferred to Walker was $80,000.00. (R.R. Vol. 3, at p. 61:8-21). Herbert agreed that the drilling rig was paid in exchange for the three wells drilled. (R.R. Vol. 3, at p. 180:10-20). Randall testified that he was seeking

6

damages of the value of the drilling rig and the expenses paid, totaling $89,596.06. (R.R. Vol. 3, at p. 114:6-17).

Randall further testified that a demand for Walker to fix the wells was made, but Walker never returned to fix them. (R.R. Vol. 3, at p. 115:4-8). He testified that Walker paid no amount towards the balance of the damages suffered. *Id*. Randall testified that he was required to hire attorneys to help and was seeking his attorney's fees. (R.R. Vol. 3, at p. 114:18-115:3). Randall's Attorney testified that the reasonable and necessary attorney's fees through trial in Randall's case amounted to $30,845.00. (R.R. Vol. 3, at p. 210:5-211:13). Walker elected not to cross-examine Randall's attorney as to the reasonable and necessary attorney's fees. (R.R. Vol. 3, at p. 212:4-10). The jury rendered a verdict in Randall's favor. (C.R., at p. 702-707).

## D.    Jury Verdict for Randall Disregarded

On June 1, 2015, the trial court granted Defendant's Herbert Walker's Motion for Judgment Non Obstante Veredicto ("JNOV") (C.R., at p. 709-711), overturning the jury's verdict for Randall and rendered a take nothing judgment against Randall for all of his claims against all defendants. (C.R., at p. 739). The JNOV was filed solely by Herbert, not WWW. (C.R., at p. 709-711). For the sake of efficiency, the jury questions and the objections raised to each are jointly laid out along with Randall's response in the Arguments below.

7

## SUMMARY OF THE ARGUMENT

### *Issue: Was there sufficient Evidence to Uphold the Jury's Verdict*

Evidence of the offer, acceptance, and terms of the agreement were placed before the jury. As is common in contested fights over oral contracts, the supporting evidence is found in the witness testimony, in the actions of the parties, and in documentation of the actions of the parties. Both parties agree that three wells were drilled on Randall's property by Walker and his sons. Both parties agree that the drilling rig and title were delivered as consideration for the drilling of those three wells. Acceptance of the terms of the oral agreements can be imputed to Walker by the jury through Walker's actions in light of the circumstances. There is sufficient evidence to uphold the jury's findings in Randall's, Frist's, and Walker's testimony. Because there was ample evidence to uphold the jury's findings, the trial court's take nothing judgment must be reversed and a judgment in line with the jury's findings rendered.

## ARGUMENTS AND AUTHORITIES

### A.    The No Evidence Standard for Attacking Adverse Findings by a Jury

In reviewing a legal sufficiency challenge, we consider evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact finder could do so, and disregard contrary evidence unless a reasonable fact finder could not do so. *Id*. at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the finding under review. *Id*. Evidence is legally insufficient when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810. The fact finder is the sole judge of the credibility of witnesses and the weight to give their testimony. *Id*. at 819. The court is not a fact finder and may not pass on the credibility of the witnesses or substitute its judgment for that of the trier of fact, even if a different conclusion could be reached on the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998).

Under the above standards, Randall presented more than sufficient evidence to uphold the jury's responses to jury questions one through four.

9

**B.** **Question Number One: Existence and Terms of the Agreement**

The first jury question was as to the existence of an agreement and the terms thereto:

> Did Terry Randall, Herbert J. Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC, agree that Herbert J Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC, would drill three water wells to a depth of 250 feet using a drilling rig owned by Terry Randall; that Herbert J. Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC, would set the tanks and the pumps on those wells; and that the wells would produce good water; and that Terry Randall would transfer ownership of his drilling rig to Herbert J. Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC, as payment for the wells?

(C.R., at p. 702). Question number one included an instruction of what evidence the Jury could look to for support:

> In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

*Id*. The jury returned an answer of "Yes" to question number one. *Id*.

*1.* *Disregarded for No Supporting Evidence*

Herbert's JNOV challenged question one on the grounds that there was no-evidence to support the terms contained therein or such terms were contradicted by Randall. (C.R., at p. 709-10). No attempt was made in the JNOV to demonstrate where the evidence was lacking. *Id*. Herbert filed "Herbert Walker's Post-Verdict Brief" ("Post-Verdict Brief"), which he argues that Randall failed to prove that

10

there was a "meeting of the minds as to all essential terms of their agreement." (C.R., at p. 726). A discussion of which essential terms are missing is not provided in the Post-Verdict Brief. (C.R., at p. 724-26).

Herbert also argues the jury's answer to question number one should be disregarded because a fact was established to the contrary as a matter of law through a judicial admission made during Randall's testimony. (C.R., at p. 710). Herbert's allegation of the existence of a judicial admission regarding question number one will be discussed jointly with a similar accusation as to question number two below.

At trial, Walker objected to the submission of question number one based upon a lack of factual and legal sufficiency, but made no objection to the inclusion of any one particular term or the instruction. (R.R. Vol. 4, at p. 5:6-6:15).

### 2. *Offer: Randall Testified of the Terms Negotiated Between the Parties*

As described above in paragraph A of the Statement of Facts, Randall testified that he and Walker discussed and agreed on each and every term found in question one. *See also Appellant's Table 1 below*. Randall and Walker's testimony and the exhibits presented were more than a scintilla of evidence of an oral agreement between the parties and of the terms thereof. *Id.*

Appellant's Table 1: Testimony and Evidence of Terms in Jury Question One.

| Term of Contract listed in Jury Question One | Support | Citation to Record |
|---|---|---|
| Drill Three Water Wells | Randall's Testimony | R.R. Vol. 3, at p. 60:8-61:24; 115:15-22; and 179:25-180:20 |
| | Walker's Testimony | R.R. Vol. 3, at p. 170:7-18; 181:6-10 |
| Depth of 250 Feet | Randall's Testimony | R.R. Vol. 3, at p. 119:4-14; 121:6-14 |
| Using Drilling Rig Owned by Randall | Randall's Testimony | R.R. Vol. 3, at p. 60:22-24 |
| | Walker's Testimony | R.R. Vol. 3, at p. 170:16-18; and 179:25-180:17 |
| Walker Would Set the Tanks and Pumps | Randall's Testimony | R.R. Vol. 3, at p. 120:19-121:5 |
| | Plaintiff's Exhibit 4 | R.R. Vol. 7, at p. 59, 60, 62, and 66 |
| Wells Would Produce Good Water | Randall's Testimony | R.R. Vol. 3, at p. 121:6-14 |
| | Walker's Testimony | R.R. Vol. 3, at p. 167:6-8 |
| Walker would be Paid by Transferring to him the Title to Randall's Drilling Rig | Randall's Testimony | R.R. Vol. 3, at p. 60:22-24 |
| | Walker's Testimony | R.R. Vol. 3, at p. 179:25-180:20 |

### 3. Acceptance: Walker Testified that He Drilled the Wells and Was Responsible for the Correct Drilling of the Wells

Randall testified that Walker agreed to the terms of the agreement. (R.R. Vol. 3, at p. 121:18-22). Notwithstanding Randall's testimony, Walker's testimony alone gave the jury plenty of evidence that Walker agreed to the terms of the

12

contract. The Jury heard undisputed testimony from Walker that the following actions occurred:

1) three water wells were drilled by Walker with Randall's drilling rig (R.R. Vol. 3, at p. 170:16-18; and 179:25-180:17);

2) Walker prepared forms to be filed with the State of Texas declaring Herbert to be the licensed driller of those three wells (R.R. Vol. 3, at p. 170:7-18);

3) Randall's drilling rig and its title were transferred as consideration for the drilling of the three wells (R.R. Vol. 3, at p. 179:25-180:20); and

4) Walker and his sons were responsible for the correct drilling of the three wells on Randall's property. (R.R. Vol. 3, at p. 181:6-10).

The jury was instructed to rely upon the actions of Walker when deciding if he agreed to the terms negotiated between Walker and Randall. (C.R., at p. 702). Randall's testimony that Walker agreed and then began drilling the wells is alone legally sufficient evidence when paired with the factual circumstances of the case to uphold the jury verdict that Walker agreed to the terms of the contract. *Regal Fin. Co., Ltd. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex.2012). Walker's testimony merely adds layers of support to that testimony which demonstrates that the terms were accepted by the parties.

13

*4.    Part Performance Under an Agreement May Remove Uncertainty and Establish that a Contract is Enforceable*

Herbert's argument that the contract is unenforceable due to lack of evidence of a meeting of the minds as to all essential elements is flawed. Rather, Texas law provides that the partial performance of both parties can render an otherwise uncertain agreement enforceable.

Whether a particular agreement is an enforceable contract is a question of law reviewed de novo. *Fiduciary Fin. Servs. of Sw. Inc. v. Corilant Fin., L.P.*, 376 S.W.3d 253, 256 (Tex. App.—Dallas 2012, pet. denied). To be enforceable, a contract must define its essential terms with sufficient detail to allow a court to determine the obligations of the parties. "Essential terms" of a contract may include time of performance, price to be paid, work to be done, service to be rendered, or property to be transferred. *Learners Online, Inc. v. Dallas Indep. Sch. Dist.*, 333 S.W.3d 636, 643 (Tex. App.—Dallas 2009, no pet.). When an agreement leaves essential terms open for future negotiation, it is not binding upon the parties and merely constitutes an agreement to agree. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 847 (Tex. 2000). However, parties may agree on some terms sufficient to create a contract, leaving other provisions for later negotiation. *Corilant Fin., L.P.*, 376 S.W.3d at 256.

The parties must have a "meeting of the minds" and must communicate

consent to the terms of the agreement. *Sadeghi v. Gang*, 270 S.W.3d 773, 776 (Tex. App.--Dallas 2008, no pet.). In determining whether there was a "meeting of the minds," and therefore an offer and acceptance, courts use an objective standard, considering what the parties did and said, not their subjective states of mind. *Komet v. Graves*, 40 S.W.3d 596, 601 (Tex. App.-San Antonio 2001, no pet.). Courts look to the communications between the parties, as well as the acts and circumstances surrounding the communications, in making this determination. *Id*.

In an analogous case, a water well driller in Tucker, Texas, disputed that he agreed to all of the terms of the contract, despite the jury finding as much. *Palestine Water Well Servs., Inc. v. Vance Sand & Rock, Inc.*, 188 S.W.3d 321, 324 (Tex. App.—Tyler 2006, no pet.). To disprove the meeting of the minds, the well driller argued that the oral representations regarding the completed water well's ability to production of a certain gallon per minute ("GPM") were guesses, not guarantees. *Id*. at 326. The well did not produce at least 200 GPM , despite the driller's verbal assurances. *Id*. at 324. A verdict was rendered against the driller for breach of contract for his failure to drill the well in accordance with the GPM requirements of the landowner. *Id*.  The court of appeals held that the testimony of the landowner and evidence of actions taken by the parties were both legally and factually sufficient for the jury's finding of a formation of a contract. *Id*. at 327.

The partial performance of the parties in this case, including the drilling of

the wells and paying of the consideration, establishes the contract as enforceable. In *Crisp Analytical Lab, L.L.C. v. Jakalam Props., Ltd*, the Dallas appeals court referenced the Second Restatement of Contracts to describe why a partially performed contract may remove any uncertainty as to the enforceability of a contract. *Crisp Analytical Lab, L.L.C., v. Jakalam Props., Ltd*, 422 S.W.3d 85, 88 (Tex. App.—Dallas 2014, pet. denied). "Part performance under an agreement may remove uncertainty and establish that a contract is enforceable as a bargain has been formed." *Id*., citing RESTATEMENT (SECOND) OF CONTRACTS § 34(2) (1981).

Walker testified as to his partial performance under the contract. Although he refused to acknowledge a contract existed, the actions he admitted to taking were a partial performance of the contract testified to by Randall. *See* Appellant's Table 1.

The jury was instructed to weigh Walker's testimony and actions, the exhibits, and Randall's testimony when coming to a conclusion as to the existence of a contract. Because there was testimony by Randall that the terms were discussed with Walker, that Walker agreed with the terms of the contract, and ample evidence that Walker took actions in furtherance of that contract, the Jury had sufficient evidence to support their response to question number one. The trial court erred in disregarding the question number one.

16

## C. Question Number Two: Breach by Walker

Question number two requested the jury to respond "yes" or "no" to the question "[d]id Herbert J. Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC fail to comply with the agreement", referring to the agreement found in question number one. (C.R., at p. 703). The jury responded "Yes." *Id.*

### 1. *Disregarded for No Supporting Evidence*

Herbert's JNOV argued that there was no evidence to support question number two or a fact was established to the contrary to it as a matter of law. (C.R., at p. 710). No explanation was given by Herbert in the JNOV as to what fact was established as a matter of law. *Id.* Herbert also attacked question number two as being immaterial once the court disregards question number one. *Id.*

### 2. *Expert Testified the Well Water was Harmful to Humans and Animals and Full of Sand*

As described above in paragraph B of the Statement of Facts, lay and expert testimony was provided to the jury that the wells in question did not produce good water and were not drilled to a depth of 250 feet. Walker stated that he could not challenge their testimony as to the water quality on well number one.  No evidence was provided to contradict the testimony or conclusions of Randall or his expert Frist.

The evidence laid out above in paragraph B of the Statement of Facts is

17

sufficient to support a jury verdict that Walker did not comply with the terms of the Contract found in question number one. The trial court erred in disregarding the question number two.

## D.    Question Number Three: Damages

Question number three requested damages for the breach of the oral agreement found in question number two, with the following element of damage for the jury's consideration: "The difference in the value of work as agreed to by the parties and the value of the work performed" (C.R., at p. 704). The jury responded with the amount "$42,500.00." *Id*.

### 1.    *Disregarded for No Supporting Evidence*

Herbert's JNOV attacked question number three claiming there was no evidence to support it or as being immaterial once the court disregards Question number one. (C.R., at p. 710).

### 2.    *$89,596.06 for Worthless Wells*

Randall testified that he bargained for and paid $89,596.06, including the value of the drilling rig and the materials bought, for the three wells. (R.R. Vol. 3, at p. 60:22-24). Randall testified that the wells drilled for him by Walker were of no value. (R.R. Vol. 3, at p. 71:6-13).

In *Palestine*, the well driller contended that there was insufficient evidence to support the damage award for the breach of contract. *Palestine Water Well*

18

*Servs., Inc.,* 188 S.W.3d at 324-27. There the evidence presented detailed $61,289.18 in damages, but only $23,678.08 was awarded. *Id.* The court noted that:

> Water wells that do not produce water as contractually agreed upon have no value to the landowner. We hold that as a matter of law, the well had no value to Vance Sand. Therefore, Vance Sand received no value for the $61,289.18 that it parted with. The $23,678.08 awarded by the jury on Vance Sand's contract cause of action was within the range of up to $61,289.18 that it could have determined "Palestine" was liable for under this contract. It is well established that in resolving damage issues, a jury's finding will be upheld if it is within the range of the testimony regarding the amount of damages incurred.

*Id*. (internal cites omitted). Because the damages awarded on question number two are within the range of evidence presented at trial, the jury's award had sufficient legal evidence supporting it. The trial court erred in granting the JNOV as to question number three.

### 3. *Walker's Attorney Stated in his Closing Arguments that the Market Value of the Wells was $22,000.00*

In the alternative from the arguments raised above, if this court finds there was not sufficient evidence to uphold the jury's findings that the three well's market value was at least $42,500.00, this court should find the value was at least $22,000.00. Walker's attorney instructed the jury in his closing remarks that the market value of the three wells as bargained for was $22,000.00. (R.R., Vol. 4 at p. 37:22-38:19). This is evidence in the form of an admission against party interest

19

and is legally sufficient evidence for the jury to uphold the jury's findings up to $22,000. *Id*.

Furthermore, Frist testified that a local well driller informed him that he would have drilled the same wells for $22,000.00. (R.R., Vol. 3 at p. 198:12-199:1). This is further evidence to support the jury's findings of damages up to $22,000.00. If this court finds that there was not enough evidence to support the jury's finding of damages in the amount of $42,500.00, Randall requests the court reverse and remand a judgment consistent with upholding the jury's findings in question number three up to $22,000.00.

## E.    Question Number Four Attorney's Fees

Question number four requested the jury decide the amount of reasonable and necessary attorney's fees for the services of Randall's attorneys through trial. (C.R., at p. 704). The jury responded with the amount "$30,845.00." *Id*. During the trial, Walker elected not to cross-examine Randall's attorney as to the reasonable and necessary attorney's fees. (R.R. Vol. 3, at p. 212:4-10).

### *1.    Disregarded for No Supporting Evidence*

Herbert's JNOV argued there was no evidence to support question number 4 or it was immaterial once the court disregarded question number one. (C.R., at p. 710). Herbert added a small amount of description to this attack stating that "[Randall] failed to provide the evidence required by Texas law to support an

20

award of attorney's fees." *Id.* Herbert's Post-Verdict Brief offered no further discussion of the "evidence required by Texas law" referred to in his JNOV. (C.R., at p. 724-26).

### 2. Uncontested, Reasonable Testimony Established the Attorney's fees as a Matter of Law

"[W]here the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct, positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law." *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990); see *Lofton v. Texas Brine Corp.*, 777 S.W.2d 384, 386 (Tex. 1989). This is "especially true where the opposing party has the means and opportunity of disproving the testimony, if it is not true, and fails to do so." *Ragsdale*, 801 S.W.2d at 882.

In determining if attorney's fees are established as a matter of law, the reviewing court may look to the following:

a) whether the opposing party had the means and opportunity of disproving or impeaching the testimony and failed to do so (*Cullins v. Foster*, 171 S.W.3d 521, 538-39 (Tex. App.- Houston [14th Dist.] 2005, pet. denied); *Brown v. Bank of Galveston*, 930 S.W.2d 140, 145 (Tex. App.- Houston [14th Dist.] 1996), aff'd, 963 S.W.2d 511 (Tex. 1998),

21

b) whether the fee is unreasonable in light of the amount involved and the results obtained (*Midland Western Bldg., L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 739 (Tex. 2009)),

c) whether attorney's fees billing records were introduced as evidence (*El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761-62 (Tex. 2012); *Schlager v. Clements*, 939 S.W.2d 183, 193 (Tex. App.- Houston [14th Dist.] 1996, writ denied)), or

d) whether the attorney's work was even necessary (*Rosenblatt v. Freedom Life Ins. Co. of Am.,* 240 S.W.3d 315, 323 (Tex. App.- Houston [1st Dist.] 2007)).

Randall's attorney testified as to the reasonable and necessary attorney's fees incurred, including segregating fees for Breach of Contract. (R.R. Vol. 3, at p. 210:5-212:10). These fees were necessary and reasonable in light of the injury sustained, loss of $89,596.06 for three bad wells, and the results obtained, a jury verdict for $42,500.00. (R.R. Vol. 7, at p. 68; and C.R., at p. 704). Herbert failed to make any challenges to the testimony placed before the trier of fact as to the reasonableness or necessity of those fees. (R.R. Vol. 3, at p. 212:4-10). Because the testimony of Randall's attorney meets the requirements laid out in *Ragsdale*, it established as a matter of law the reasonableness and necessity of the attorney fees incurred by Randall.

22

### 3.   *Evidence was put before the jury of at least $30,845.00 in reasonable attorney fees.*

In general, the reasonableness and value of attorney's fees is a question of fact for the jury's determination. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998); *Brown*, 930 S.W.2d at 145. "The reasonableness of attorney's fees is ordinarily left to the factfinder, and a reviewing court may not substitute its judgment for the jury's." *Smith v. Patrick W.Y. Yam Trust*, 296 S.W.3d 545, 546 (Tex. 2009).

It is Herbert's burden to show that there is no evidence supporting the Jury's award of attorney's fees. *Cale's Clean Scene Carwash, Inc. v. Hubbard*, 76 S.W.3d 784, 786 (Tex. App.- Houston [14th Dist.] 2002, no pet.) This Court must first examine the record for evidence to support the jury finding while ignoring all evidence to the contrary. *Id*.

Even if the evidence put before the jury failed to establish the attorney's fees as a matter of law, there is still some evidence to support the jury's award of attorney's fees. The trial court erred in disregarding the question number four when attorney's fees were established as a matter of law, and in the alternative, were upheld by sufficient credible evidence.

## F. Request to Find a Judicial Admission: Raised as to Question One and Two

Herbert's JNOV attacked question number one and two claiming there was a

23

fact established to the contrary as a matter of law, or a judicial admission. (C.R., at p. 710).

As to question number one, the explanation given in the JNOV for this argument was "[Randall]'s own testimony constitutes a judicial admission that he did not an [sic] agreement with [Walker] of the nature asked about in question one."*Id*. Herbert's Post-Verdict Brief offered no further discussion, explanation of this argument. (C.R., at p. 724-26).

As to question number two, no explanation was given in the JNOV or Post Verdict Brief as to what terms were at issue or where the contradiction lay. *Id.* No objections were made at the time of submission of jury question one or two based upon the existence of a judicial admission. (R.R. Vol. 4, at p. 5:6-7:7).

### 1. *Herbert Cannot Rely on a Judicial Admission that He Failed to Protect*

This court need not reach the issue of whether a judicial admission existed in the testimony at trial as Herbert failed to object to the submission of evidence, testimony or jury questions because they were contrary to the facts established in a judicial admission. As such, Herbert cannot rely upon a judicial admission to retroactively invalidate evidence in support of the jury questions. *See Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989); *Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762, 765 (Tex. 1987).

In *Hurlbut v. Gulf Atlantic Life Ins. Co.*, the trial defendant failed to make an objection to evidence or testimony during its admission at trial as being contrary to a judicial admission. *Hurlbut,* 749 S.W.2d at 765. The first mention of a judicial admission came in the defendant's motion for JNOV. *Id*. The court declared that: "We need not decide whether plaintiffs' pleadings clearly and unequivocally concede the existence of facts amounting to a judicial admission of limitations because defendants did not stand on this alleged admission." *Id*.  The court further instructed the defendant that a "party relying on an admission must protect it by objecting to the introduction of evidence contrary to the admission and by objecting to the submission of any issue bearing on the fact or facts admitted." *Id*.

Because Herbert failed to raise the issue to the trial court at the time of the submission of the questions, he cannot raise the issue of a judicial admission.  The trial court erred in relying upon judicial admissions to disregard the jury's findings.

2. *Contradictory Testimony is a Quasi-Admission for the Fact Finder to Resolve*

In Herbert's JNOV, he made an accusation that a fact was established as a matter of law or a judicial admission occurred contrary to the findings in question number one.

A judicial admission is "a formal waiver of proof usually found in pleadings or the stipulations of the parties." *Mendoza v. Fidelity & Guar. Ins. Underwriters,*

25

*Inc.*, 606 S.W.2d 692, 694 (Tex.1980). A judicial admission should be distinguished from a "quasi-admission," which is a party's testimonial declaration that is contrary to the party's position. *See Id.*; *TX Far West, Ltd. v. Tex. Invs. Mgmt.*, 127 S.W.3d 295, 308 (Tex. App.—Austin 2004, no pet.). Quasi-admissions are "merely some evidence, and they are not conclusive upon the admitter." *Mendoza*, 606 S.W.2d at 694, citing *Harris Cnty. v. Hall*, 172 S.W.2d 691, 694-95 (Tex. 1943). The trier of fact must decide what weight to give quasi-admissions. *Id.*

A party's testimonial quasi-admission will preclude recovery if it meets the requirements set out in *Griffin v. Superior Insurance Co.*, 338 S.W.2d 415, 419 (Tex.1960) and *United States Fidelity & Guaranty Co. v. Carr*, 242 S.W.2d 224, 229 (Tex.Civ.App.—San Antonio 1951, writ ref'd n.r.e.).

Herbert made no attempt to reveal the judicial admission, or "fact established contrary as a matter of law" or overcome the "hypothesis of a mere mistake or slip of the tongue." *Mendoza*, 606 S.W.2d at 694. Herbert failed to uphold his burden before the trial court to prove that a fact was established as a matter of law or that a judicial admission occurred. Without any guidance from Herbert, the trial court erred in disregarding question number one and two based upon a judicial admission or fact established as a matter of law.

26

## G. Walker Water Wells did not file any Post-trial Motions.

WWW did not file any challenges to the jury findings. (C.R., at p. 709 and 724). The trial court's judgment states that the "Defendants moved" for the JNOV and that the "Defendants' motion should be granted." The Judgment then rendered was in favor of all Defendants therein, both Herbert and WWW. (C.R., at p. 739).

The trial court erred in issuing a take nothing judgment as to all parties and all claims as WWW made no objections to the jury responses and filed no motions to which the trial court could grant. The trial court's issuance of a take noting judgment granted relief to a party that neither request it nor upheld their burden of proving that they deserved it.

## CONCLUSION

There was more than sufficient evidence presented in the trial to uphold the jury's response to questions one through four. None of these questions were immaterial to the claim before the jury. Herbert failed to show that a judicial admission occurred or protect that judicial admission by using it to object to the submission of evidence or jury questions. Since the jury returned a clear verdict, further fact finding is unnecessary. Appellant asks that this court reverse the trial court's judgment and render a final judgment for Appellant in accordance with the jury's findings. (C.R. at p. 699-707). *Miller v. Bock Laundry Machine Co.*, 568 S.W.2d 648, 652 (Tex. 1977)

## PRAYER

Appellant, Terry Randall, prays that this Court grant his Appeal and reverse the Trial Court's Judgment and render a judgment in accordance with the jury's findings in Appellant's favor of $42,500.00 in damages; attorney's fees of $30,845.00; costs of court and appeal; pre-trial interest, and post-judgment interest as provided by law and for any other award Appellant is due in equity.

Respectfully submitted,

**THE WELSCHER LAW FIRM**


*/s/ S. Cory Sells*
S. Cory Sells
State Bar No. 24075525
Craig Welscher
State Bar No. 21167200
The Welscher Law Firm, P.C.
1111 North Loop West, Suite 702
Houston, Texas 77008
(713) 862-0800 – Telephone
(713) 862-4003 – Facsimile
Email: csells@welscherlaw.com
*Attorneys for Appellant*


## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing instrument is in compliance with the word count limit of TRAP 9.4(i)(2)(B) of 15,000 words as it contains 7,295 words.

*/s/ S. Cory Sells*
S. Cory Sells

28

## CERTIFICATE OF SUPPORT

I certify that I have reviewed the record and brief and have concluded that every factual statement made in the brief is supported by competent evidence included in the appendix or record.

/s/ S. Cory Sells
S. Cory Sells

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was forwarded to all known counsel of record in the manner required by Texas Rule of Appellate Procedure 9.5, on this the 29th day of September, 2015.

*Via Electronic Service*
Alex Metcalf
807 Pecan Street
Bastrop, Texas 78602

/s/ S. Cory Sells
S. Cory Sells

# APPENDIX

**1.** <u>*Clerk's Record*</u>

   a. Charge of the Court

   b. Defendant's Motion For  Judgment Non Obstante Veredicto

   c. Defendant, Herbert Walker's Post Verdict Brief

   d. Judgment

**2.** <u>*Reporter's Record*</u>

   **a. Volume 3**

     i. Excerpts of Examination of Terry Randall

     ii. Excerpts of Examination of Herbert Walker

     iii. Excerpts of Examination of Tom Frist

     iv. Excerpts of Examination of S. Cory Sells

   **b. Volume 4**

     i. Objections By Mr. Metcalf, Attorney for Appellees on Submission of Jury Question One and Two

     ii. Excerpts of Closing Statements by Mr. Metcalf

   **c. Volume 7**

     i. Plaintiffs' Exhibit 2

     ii. Plaintiffs' Exhibit 4

     iii. Plaintiffs' Exhibit 8

# CLERK'S RECORD

## CLERK'S RECORD

### VOLUME 1 of 1
Trial Court Cause No. 423-2441
Court of Appeals No. 03-15-00317-CV
In the 423rd District Court
of Bastrop County, Texas,
Honorable Christopher D. Duggan, Judge Presiding

TERRY RANDALL V. HERBERT WALKER DBA WALKER WATER WELL; WALKER WATER WELL SERVICES, LLC; THOMAS WALKER, and ADAM WALKER

Appealed to the 3RD COURT OF APPEALS
For County Court at Law of Texas, at Bastrop, Texas

**Attorney for Appellant(s):**

Name: Craig Welscher
Address: 1111 North Loop West, Suite 702
Telephone no.: 713-862-0800
Fax no.: 713-862-4003
E-mail address: cwelscher@welscherlaw.com
SBOT no.: 21167200
Attorney for: Terry Randall, Appellant(s)

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/22/2015 6:23:30 PM
JEFFREY D. KYLE
Clerk

E-Filed to the 3rd Court of Appeal for the
County Court at Law of the Texas, at Bastrop, TX on the 22ND day of June, 2015.

SARAH LOUCKS
BASTROP COUNTY DISTRICT CLERK

By: Civil Deputy Clerk. Katy Nyc

**Appellate Court Cause 03-15-00317-CV**
Filed in the Court of Appeals for the
District of Texas, at Austin, Texas on this the __ day of_____, 2015.

Jeffrey D. Kyle, Clerk By:_____, Deputy

CAPTION


THE STATE OF TEXAS

COUNTY OF BASTROP

In the 423rd District Court of Bastrop County, Texas the Honorable Christopher D. Duggan, Judge Presiding, the following instruments and other papers were filed in this cause, to-wit:

Trial Court Cause No.423-2441


TERRY RANDALL VS. HERBERT J WALKER dba WALKER WATER WELL; WALKER WATER WELL SERVICES, LLC; THOMAS WALKER, and ADAM WALKER

# a.

# CHARGE OF THE COURT



NO. 423-2441

| | | |
|---|---|---|
| .ERRY RANDALL, **Plaintiff,** | § § § | IN THE DISTRICT COURT |
| V. | § § | 423RD JUDICIAL DISTRICT |
| HERBERT J. WALKER dba WALKER WATER WELL; and WALKER WATER WELL SERVICES, LLC **Defendants.** | § § § § § § | OF BASTROP COUNTY, TEXAS |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember your previous instructions: Do not discuss the case with anyone else, either in person or by other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberation, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1.  Do not let bias, prejudice or sympathy play any part in your decision.

2.  Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not presented in the courtroom.

3.  You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.  If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

Scanned

FILED
DATE
Sarah Loucks
District Clerk, Bastrop County

699

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless otherwise instructed. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence admitted in this case. If you do not find that a preponderance of the evidence supports a "yes," then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

7. Do not decide who you think should win before you answer the question and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.



700

**Presiding Juror:**

1. When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2. The presiding juror has these duties:

   a. have the complete charge read aloud if it will be helpful to your deliberations;

   b. preside during your deliberations, meaning manage the discussions, and see that you follow these instructions;

   c. give written questions or comments to the bailiff who will give them to the judge;

   d. write down the answers you agree on;

   e. get the signatures for the verdict certificate; and

   f. notify the bailiff that you have reached a verdict.

**Instructions for Signing the Verdict Certificate:**

1. Unless otherwise instructed, you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2. If 10 jurors agree on every answer, those 10 jurors sign the verdict.

   If 11 jurors agree on every answer, those 11 jurors sign the verdict.

   If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

   As I have said before, if you do not follow these instructions, you will be guilty of jury misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

Submitted to the jury the 16th day of January, 2015, at 9:42 A m.

_____
Judge Presiding

Scanned

701

QUESTION #1

Did Terry Randall, Herbert J Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC agree that Herbert J Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC would drill three water wells to a depth of 250 feet using a drilling rig owned by Terry Randall; that Herbert J Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC would set the tanks and the pumps on those wells; that the wells would produce good water; and that Terry Randall would transfer ownership of his drilling rig to Herbert J Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC as payment for the wells?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

Answer "Yes" or "No."

Answer:   _YES_

Scanned

702

Scanned

Answer Question #2 if you answered "yes" to Question #1, otherwise, do not answer Question #2.

QUESTION #2

Did Herbert J Walker d/b/a Walker Water Well, and Walker Water Well Services, LLC fail to comply with the agreement?

Answer "Yes" or "No."

Answer: _YES_

Scanned

703

Answer Question #3 if you answered "yes" to Question #2, otherwise, do not answer Question #3.

QUESTION #3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Terry Randall for his damages, if any, that resulted from such failure to comply?

Consider the following element of damages, if any, and none other. Do not add any amount for interest on damages, if any.

The difference in the value of the work as agreed to by the parties and the value of the work actually performed.

Answer in dollars and cents for damages, if any.

Answer: $42,500.00

Scanned

704

Answer Question #4 if you answered "yes" to Question #3, otherwise, do not answer Question #4.

QUESTION #4

What is a reasonable fee for the necessary services of Terry Randall's attorney for representation in the trial court, stated in dollars and cents?

Answer: $ 30,845.00

Scanned

705

## VERDICT CERTIFICATE

**Check one:**

_____ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____       _____
      Signature of Presiding Juror           Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

__✓__ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

Scanned

706

| Signatures | Printed Name |
|---|---|
| 1. | Micheal E. Lord |
| 2. | G Dale Johnson |
| 3. | William Cantrell |
| 4. | Gary HOSEA |
| 5. | Neil White |
| 6. | Keila Batlle |
| 7. | Judith Edwards |
| 8. | GREG SCHlosseR |
| 9. | LONNIE L. BUCK |
| 10. | Clark A. Hilbig |
| 11. | |

Received from the jury this 16th day of January, 2015, at 1:52 o'clock P .m., accepted and filed.

_____
Judge Presiding

Scanned

# b.

# DEFENDANT'S MOTION FOR JUDGMENT NON OBSTANTE VEREDICTO

NO. 423-2441

| TERRY RANDALL | § | IN THE DISTRICT COURT |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| V. | § | 423RD JUDICIAL DISTRICT |
| | § | |
| HERBERT J WALKER dba | § | |
| WALKER WATER WELL; and | § | |
| WALKER WATER WELL | § | |
| SERVICES, LLC | § | |
| Defendants. | § | OF BASTROP COUNTY, TEXAS |

## DEFENDANT'S MOTION FOR JUDGMENT NON OBSTANTE VEREDICTO

### TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Defendant, Herbert Walker, Movant herein, and brings this Motion for Judgment Non Obstante Veredicto. In support hereof, Movant shows the following:

I.

### INTRODUCTION

A. Plaintiff sued Defendant for breach of contract.

B. A trial on the merits was had, the Court submitted this case to the jury on questions. The jury returned a verdict in favor of Plaintiff, Terry Randall, based on such questions.

C. The jury's findings were received by the Court and filed and entered in the minutes of the Court. The questions submitted to the jury and the findings on those questions are incorporated herein as if recited verbatim.

II.

### ARGUMENT AND AUTHORITIES

A. Movant requests this Court to disregard all of the jury's findings and enter Judgment Non Obstante Veredicto for the reasons specified herein.

B. Movant requests the Court to disregard the jury's answer to question 1.

1. The jury's answer to question 1 should be disregarded because there is no evidence to support it. This question asked the jury to find if there was an agreement

---

709

containing certain terms. Many of these terms were never testified to at all, or were contradicted by Plaintiff's own testimony.

2. The jury's answer to question 1 should be disregarded because a fact was established to the contrary as a matter of law. The Plaintiff's own testimony constitutes a judicial admission that he did not an agreement with Defendant of the nature asked about in question 1.

C. Movant requests the Court to disregard the jury's answer to question 2. The jury's answer to question 2 should be disregarded because there is no evidence to support it, or because a fact was established to the contrary as a matter of law. Additionally, the jury's answer to question 2 should be disregarded because it is immaterial once the Court disregards the answer to question 1.

D. Movant requests the Court to disregard the jury's answer to question 3. The jury's answer to question 3 should be disregarded because there is no evidence to support it. Additionally, the jury's answer to question 3 should be disregarded because it is immaterial.

E. Movant requests the Court to disregard the jury's answer to question 4.

1. The jury's answer to question 4 should be disregarded because there is no evidence to support it. Question 4 asks the jury to find an amount of reasonable and necessary attorney's fees. However, Plaintiff failed to provide the evidence required by Texas law to support an award of attorney's fees.

2. The jury's answer to question 4 should be disregarded because it is immaterial.

**WHEREFORE, PREMISES CONSIDERED**, Movant prays that the Court grants this Motion for Judgment Non Obstante Veredicto and disregards all the jury's findings in this cause, and for such other and further relief that may be awarded at law or in equity.

710

Respectfully submitted,

Alex Metcalf
807 Pecan Street
Bastrop, Texas 78602
Tel: (512) 303-6963
Fax: (512) 303-6766


By:/s/ Alex Metcalf
Alex Metcalf
State Bar No. 24058000
Attorney for Defendant


## Certificate of Service

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on March 3, 2015.

/s/ Alex Metcalf
Alex Metcalf
Attorney for Defendant

711

# c.

# DEFENDANT, HERBERT WALKER'S POST VERDICT BRIEF

NO. 423-2441

| | | |
|---|---|---|
| TERRY RANDALL | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| V. | § | 423RD JUDICIAL DISTRICT |
| | § | |
| HERBERT J WALKER dba | § | |
| WALKER WATER WELL; and | § | |
| WALKER WATER WELL | § | |
| SERVICES, LLC | § | |
| Defendants. | § | OF BASTROP COUNTY, TEXAS |

## DEFENDANT, HERBERT WALKER'S POST-VERDICT BRIEF

There is no contract between Terry Randall and Herbert Walker. In order for the Plaintiff to recover on his claim for breach of contract, he must first prove that he and the Defendant reached an agreement on all the essential terms of the contract. This is a question of law for the Court. A jury may decide whether the parties reached an agreement, but only the Court can determine whether that agreement contained all the essential terms to be an enforceable contract. In this case, it does not.

### I. The Law

The 14th Court of Appeals has summarized the division of labor between judge and jury in these cases well.

> "Whether the parties reached an agreement is a question of fact. Whether an agreement has all the essential terms to be an enforceable agreement, however, is a question of law."

*Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 653 n. 8 (Tex.App.-Houston [14th Dist.] 2003, pet. denied)(citations ommitted).

As the Court correctly observed in the prior hearing, the Supreme Court has provided trial judges with ample guidance in the *T.O. Stanley* case as to the proper determination of contract enforcability. A contract is not enforceable unless the court can determine the parties' legal obligations and liabilities. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221

---

*Defendant's Post-Verdict Brief*          Page 1 of 3

724

(Tex.1992); *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex.App.--Houston [1st Dist.] 1992, writ denied); *University Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex.App.--San Antonio 1989, no writ). In order to be enforceable, therefore, the parties must have agreed on the material terms. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d at 221. If an essential term is left open for future negotiation, the contract is not binding. *Id.; Cap Rock Elec. Co-op., Inc. v. Texas Utilities Elec. Co.*, 874 S.W.2d 92, 99 (Tex.App.--El Paso 1994, no writ). The jury may not be called upon to construe the legal effect of an agreement or to supply an essential term upon which the parties did not mutually agree. *Id.*; see also *University Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d at 710.

## II.    The Facts

The only evidence Plaintiff offered at trial regarding the terms of the alleged contract was his own testimony about phone calls with the Defendant. Plaintiff's testimony is actually quite convoluted on the terms that were offered, and on whether or not these terms were communicated to Defendant. As the Court will remember, Plaintiff described a process that started a week or more before the Defendant or anyone associated with him started doing any work for the Plaintiff and continued until sometime during or after the work was performed. During that process, the terms of the "offer" apparently changed repeatedly regarding the depth to which the wells would be drilled, who would do the drilling, who would be paid for the work, and how payment would be achieved.

Plaintiff offered no evidence that whatever offer he made was ever accepted by the Defendant. Not only was Plaintiff's own testimony on that topic contradictory, Defendant testified that instead of being asked to do any work for the Plaintiff, he was asked by Plaintiff to recommend employees to Plaintiff to perform the work. Plaintiff does not even know which of the remaining Defendants he believes he has a contract with: Herbert Walker or Walker Water Well Services.

725

**III. Conclusion**

It is a fundamental principal of contract law that, to form a binding contract, the parties must have a "meeting of the minds" on the essential terms of the contract. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex.2008). In other words, the essential terms of the contract must be agreed on before a court can enforce the contract. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221. In this case, not only did the Plaintiff fail to prove mutual assent, the Plaintiff actually testified that he and the Defendant "weren't on the same page" about the terms of any agreement. Since the Plaintiff has not met his burden of proving that the parties had a meeting of the minds as to all essential terms of their agreement, his claim for breach of contract must fail.

Respectfully submitted,

The Law Offices of Alex Metcalf
807 Pecan Street
Bastrop, TX 78602
512-303-6963 (phone)
512-303-6766 (fax)

By: /s/Alex Metcalf
       Alex Metcalf
       State Bar No. 24058000
       ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel of record, in accordance with the Rules of Civil Procedure, on the 17th day of April, 2015.

/s/ Alex Metcalf
       Alexander Metcalf

726

# d.
# JUDGMENT

## NO. 423-2441

| | | |
|---|---|---|
| TERRY RANDALL | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| V. | § | 423RD JUDICIAL DISTRICT |
| | § | |
| HERBERT J WALKER dba | § | |
| WALKER WATER WELL; and | § | |
| WALKER WATER WELL | § | |
| SERVICES, LLC | § | |
| Defendants. | § | OF BASTROP COUNTY, TEXAS |

### JUDGMENT

At the hearing on this cause, all parties appeared through their attorneys of record and announced that they were ready for trial.

A jury was duly accepted, impaneled, and sworn. A verdict was returned and received by the Court. Thereafter, Defendants moved for a Judgment Non Obstante Veredicto. The Court has considered the pleadings and official records on file in this cause, the evidence, and the arguments of counsel and is of the opinion that Defendants' motion should be granted and that judgment should be rendered for Defendant.

It is accordingly ADJUDGED that Plaintiff take nothing as a result of this suit.

This judgment finally disposes of all parties and all claims and is appealable.

SIGNED on ___June 1st, 2015___.

JUDGE PRESIDING

APPROVED AS TO FORM:

_____
Alex Metcalf
Attorney for Defendants

_____
Cory Sells
Attorney for Plaintiff

Filed __10:00A__ m

JUN 0 1 2015

Sarah Loucks
District Clerk, Bastrop County 739

# REPORTER'S RECORD

## RECORD

*a.*

*VOLUME 3*

OFFICIAL REPORTER'S RECORD

VOLUME 3 OF 7 VOLUMES

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/13/2015 11:13:24 AM
JEFFREY D. KYLE
Clerk

TRIAL COURT CAUSE NO. 423-244

APPELLATE CAUSE NO. 03-15-00317-CV

TERRY RANDALL                 *   423RD JUDICIAL DISTRICT COURT

VS.                           *   OF BASTROP

HERBERT J. WALKER, ET AL*  BASTROP COUNTY, TEXAS

*******************************************************

JURY TRIAL

*******************************************************

On the 15th day of January, 2015 the above entitled and numbered cause came to be heard; and the following proceedings were had before the Honorable Judge Christopher D. Duggan, Judge Presiding, held in Bastrop, Bastrop County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's Record produced by computer-assisted transcription.

MICHELE FRITSCHE, Texas CSR #3964

Official Court Reporter - 423rd Judicial District Court

Bastrop County, Texas

804 Pecan Street

Bastrop, Texas 78602

(512)581-4239

APPEARANCES

ATTORNEY FOR PLAINTIFF
Mr. Steven Cory Sells
Bar Card Number: 24075525
Work Address: 1111 North Loop W Ste 702
Houston, TX 77008-4715
Work Phone Number: 713-862-0800

Mr. Craig Welscher
Bar Card Number: 21167200
Work Address: 1111 North Loop W Ste 702
Houston, TX 77008
Work Phone Number: 713-862-0800


ATTORNEY FOR DEFENDANTS
Mr. Alexander Dale 'Alex' Metcalf
Bar Card Number: 24058000
Work Address: 807 Pecan St
Bastrop, TX 78602-3817
Work Phone Number: 512-303-6963

Mr. William Hartford Jenkins
Bar Card Number: 24012908
Work Address: PO Box 547
908 Chestnut St
Bastrop, TX 78602-3302
Work Phone Number: 512-303-4700

# i.

# EXCERPTS OF EXAMINATION OF TERRY RANDALL

All right.  Mr. Sells, you may call your first witness.

MR. SELLS:  I would call Mr. Terry Randall.

THE COURT:  Raise your right hand.

(Witness was sworn by the Judge)

TERRY RANDALL,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

THE COURT:  All right.  Have a seat.

Q.  MR. SELLS:  Mr. Randall, could you please --

THE COURT:  Hold on.  Let me make sure -- would you kind of tap on that?  There we go.  Mr. Sells.

Q.  MR. SELLS:  Mr. Randall, could you state your name for the record.

A.  My name is Terry L. Randall.

Q.  Defendants have made some claims that you're a plumber; is that correct?

A.  That is correct.

Q.  How long have you been a licensed plumber?

A.  I've been a licensed plumber since the early '70s.

Q.  And do you have a company -- a plumbing company as well; is that correct?

A.  I do, sir.

Q.  Do you have a water well drilling company?

A.   No, sir, I don't.

Q.   Do you consider the two things to be the same?

A.   It is separate.

Q.   So just because there's pipes involved in a well doesn't mean the same as plumbing a house?

A.   No, sir.  It's totally different.  It's licensed by a total different regulation.  I think it's the Texas Environment Quality Control.  And I'm licensed by Texas Board of Plumbing Examiners.

Q.   When did you first meet Mr. Herbert Walker?

A.   Well, I didn't first meet Herb Walker until we had made a deal.  But I had talked to Herb Walker in the past.  So we had purchased some property in Bastrop, and we were on Aqua Water well, but I was planning on -- we had bought a river house on the river and I wanted to -- me and my wife wanted to build us a house -- and I've always, from the houses I've built, most of them have been on tracts of land.  And I've always had water wells that were put in.  And in the process, we had decided that we was going to build us a house and I had decided to have three wells on the property.  One for the existing river house, one for the new house I was going to build, and I wanted one for my livestock.  And so in the process I thought about saving money, you know, doing it.  I've done jobs in the past where -- I'm from

the Woodlands and I had bought an eighty-five acre tract in the Woodlands and I cleared all the property and dug a seven acre lake.

Q. Mr. Randall, if we could jump ahead real quick, sir, when did you contact Mr. Walker?

A. I contacted Mr. Walker in regards to a drilling rig I had seen on Craig's List.

Q. And why did you contact him?

A. I contacted him because he was the representative of the people that were selling the drill rig, you know, on the Craig's List.

Q. Did you get a chance to see that drilling rig?

A. Yes, sir, I did. Mr. Walker told me where to go to look at the drill rig. I went to -- I think it was Hempstead.

Q. And how much was that rig for? How much was that drilling rig for?

A. I'm not for sure, but I think it was like $50,000 or 60 or something like that.

Q. Did it run?

THE COURT: Excuse me, Mr. Sells. If I could interrupt, it is permissible, Ladies and Gentlemen of the Jury, you can either stand or sit while you're doing examination. Some lawyers are more comfortable standing or sitting. Some judges are more picky than I

am. Federal judges come to mind. I'm not a Federal judge. So you may sit while you're asking questions.

MR. METCALF: Your Honor, I've got to object to this last question, I think this line of questioning, on two grounds -- first, I believe the witness was speculating there. He just said he doesn't know how much it was listed for. He was guessing. And I would object that calls for speculation. And, secondly, Your Honor, I don't believe that this prior course of dealing has anything to do with the agreement that plaintiff claims to have later on with Mr. Walker. So I object it's irrelevant.

THE COURT: Response, Mr. Sells.

MR. SELLS: Mr. Metcalf has already raised some contention about what the value he paid for the rig was accurate. He was previously shown another rig which had a value and was in a certain condition. We think that's at least material to his complaint that what he eventually paid for a rig was or was not the actual market value of that rig.

THE COURT: All right. Overruled. You may answer the question.

Q. MR. SELLS: Do you need me to repeat the question?

A. Yes, sir. If you don't mind.

Q. Do you recall what the value of that rig was?

A. It was 50, $60,000.

Q. Did it operate?

A. No, sir, it didn't.

Q. So Mr. Walker pointed you in the direction of a rig that was valued at 50 or $60,000 and did not work; is that correct?

A. It did not work. I went out to the place where the fellow was selling the rig. He couldn't get it cranked, it was flat tires, it was really just a piece of junk -- I mean what I seen.

Q. Did you end up buying a drilling rig?

A. Did I buy a drilling rig, yes, sir.

Q. And was that drilling rig a 1978 International?

A. It was. It was a Simcoe 5000, 1978 on an International truck, yes, sir.

Q. How much did you end up paying for that?

A. I think it was like -- I believe it was 75,000.

MR. SELLS: Your Honor, may I approach the witness with an exhibit?

THE COURT: You may.

Q. MR. SELLS: This is Exhibit 1. I believe this one has been pre-admitted. May I publish it to the jury?

THE COURT: First of all, has it marked?

MR. SELLS: This is the one that was pre-admitted. It has Exhibit Number 1 on it.

THE COURT: If you will show that to both defense counsels.

MR. METCALF: Your Honor, this is one we agreed to for trial.

THE COURT: All right. Plaintiff's Exhibit Number 1 is admitted. And yes, you may publish it. One other thing, Ladies and Gentlemen of the Jury, when the jury does go back there to deliberate, all exhibits will be sent back there for you to look at for your use and in deliberations. When a lawyer asks me, may I publish that, that means may I show it to the jury. We use very fancy words in the law. But that is basically what it means when they publish it. They show it to you. But don't worry about examining it in great depth right now. You can, if you certainly want to, but I want to, once again, make sure you know that all exhibits that are admitted under my rulings will be sent back with the jury for their use during their deliberations. All right. Go ahead.

Q. MR. SELLS: Mr. Randall, could you explain what this document is to the jury?

A. This document is an application for Texas Certificate of Title. It's where that I was purchasing

the rig from a fellow named Bill Radshaw (phonetically) that lived in Salem, Ohio.

Q. Did you ever file this application?

A. I'm not -- sir, I don't remember if I filed this or it was something I filled out for him. I'm not for sure.

Q. Did you attempt to use the rig on your own?

A. No, sir.

Q. How did you learn how to use the drilling rig?

A. I learned to use the drilling rig after I purchased it. I thought it would be a good idea. I mean it looked like a pretty complicated piece of equipment. And I had already been dealing with Herb Walker on the rigs, you know, so to speak, obtaining one. And he had called me a couple of times a week and talked to me. And I told him that I'd bought a rig, and he had offered his services to help me out in any way. And even offered to help me operate the rig to show me -- I mean I wasn't that familiar with it. So I thought it was a good idea. Probably the best, safest idea, maybe to have somebody that knew what they were doing, as far as operating rigs, to come and show me how. So he had agreed -- we come to an agreement that he would come down and operate the rig on the first well that was to be drilled.

Q.   And did he teach you how to operate the drilling rig equipment on that first well?

A.   I -- I didn't physically operate it myself.  Herb Walker was the one that operated it.  All the time we were drilling the first well, or attempted to drill the first well with his son, Tommy -- Tommy came with him -- Tommy come up in a little -- they had a little blue Ford truck.

Q.   Is that Mr. Thomas Walker?

A.   Thomas Walker, yes.  And one of the others drove a well drilling truck -- not a well drilling, but a well equipment truck that had equipment on the back for wells.

Q.   Did this well ever produce good water?

A.   No, sir, it didn't.  Mr. Walker come down to help me operate the rig, or show me how to operate the rig, and we drilled for a couple of days.  We had a lot of problems, like was mentioned, with the gravel -- there was gravel in the river -- close to the river bottom. We got through the gravel, went down about 60 feet and, 60, 65 feet and Mr. Walker says, we're there.  You know it was sand showing, no water.  But he said, we're there.  He said we just need to work it.  You know, work the well to make it produce water.

Q.   Did that well ever produce good water?

A.   No, sir, it didn't.

Q.   Did you pay Mr. Randall -- I'm sorry, did you pay Mr. Walker for his time?

A.   I did, sir.  This was a separate deal from the agreement with the rig.  I gave Mr. Walker a check, I think for a thousand dollars, for showing me how to operate the rig, you know, and he left me, like I say, with the process of developing the well.  Which he said he it needed to be blew out.  You know, I've been seeing wells done before where they blow it out and blow and they produce.

MR. SELLS:  Your Honor, may I approach the witness with what's been marked as Plaintiff's Exhibit Number 2?

THE COURT:  Yes, sir.

Q.   MR. SELLS:  Mr. Randall, are you an owner or custodian of records for General Plumbing?

A.   Yes, sir, I am.

Q.   Is that your plumbing company?

A.   It is, sir.

Q.   Is this exhibit, Plaintiff's Exhibit Number 2, a record of General Plumbing?

A.   Yes, sir.  It's a check made out from my plumbing company to Walker Well Service in the amount of 12,000 -- I mean, $1205.

Q.   Is it the regular course of business for -- of yours and General Plumbing that a representative of yours or General Plumbing with knowledge of the actual events to plan to record or make record, transmit the information therein?

A.   Yes, sir.  It wasn't uncommon for me, being the president of General Plumbing Contractors, to go ahead and use a company check.  Which I had.  And then go ahead and reimburse the company later on for personal.

Q.   Was this record made at or near the event in question, giving the check to Mr. Walker?

A.   Yes, sir, this was right after -- I want to say probably about two or three days after we had -- he had run the rig and got down about 65 feet.

Q.   Was this an original or exact duplicate of the original check?

A.   It is an exact duplicate, yes, sir.

Q.   You are --

MR. SELLS:  Your Honor, I offer Plaintiff's Exhibit Number 2 for the record.

MR. METCALF:  No objection, Your Honor.

MR. JENKINS:  No objection.

MR. SELLS:  May I publish it to the jury?

THE COURT:  You may.  Plaintiff's Exhibit Number 2 is admitted.

Q. MR. SELLS: Can you tell the jury what this item is?

A. This item Number 2?

Q. Yes. Plaintiff's Exhibit Number 2.

A. Yeah, it's a copy of the check that I wrote to Walker -- Herb Walker/Walker Water Well after we had drilled down about 65 feet and placed the casing. He placed the casing and says, we're there. It just needs to be worked with to make it produce water.

Q. So it's your understanding that you were dealing with Herb Walker and Walker Water Well Service?

A. I was only dealing with Herb Walker. I have never dealt with his sons on a personal or business basis. My dealing all along has been with Herb Walker.

Q. Did you attempt to run the rig on your own after Mr. Walker showed you how to you operate it?

A. I did, sir.

Q. Was that a successful attempt?

A. No, sir, it wasn't. As Mr. Walker's attorney was saying, I had the expense -- we went down about 100 foot and just like we were talking earlier, the area where you're drilling, it has a lot of pea gravel. It's pretty tough to get through. And we mixed -- I'm sorry -- a mud slurry -- we had a mud pit dug to where you could run your circulating water to coat the inside

of drilling hole where it would keep anything from caving in, and we were running -- I was, me and my brother-in-law, -- I say we -- me and brother-in-law was running the rig and got down about 100 foot and we noticed all the water left our pit where we circulate the water.  And immediately after that I shut the rig down and I said, well, I need to go ahead and fill the pit back up with water and mix up another slurry.  I made the mistake --

Q.   Just keep it simple for the jury.

A.   Okay, sir.

Q.   You weren't capable of doing it on your own?

A.   No, sir.  In fact, I should have come out with the drill pipe rig, and I didn't.  And not like the attorney said, I didn't twist it off, it got stuck.  I used an excavator to try to pull it out, and I couldn't do it, and so I said, I'll try to salvage what I can. So I took a pipe wrench and we backed off the pipe and were able to save everything but one joint of pipe and a bit.

Q.   And you had to purchase a new bit for that; is that correct?

A.   That is correct, sir.

Q.   And that new bit was on the drilling rig that you gave to Mr. Walker?

A.   It was, sir.

Q.   Did you contact Mr. Walker or did he contact you after that -- your attempt to drill that hole?

A.   He had contacted me.  Like I say, he was on a -- seemed like a continual basis of contacting me twice a week to see how things were going and see how I was doing.  And how everything was going.

Q.   Did you ask him then if he'd come down and drill you three good water wells?

A.   Yes, sir.  I mentioned it to him.  I explained to him what had happened, and he said, well, I could have probably saved the bit.  There's techniques we could do to get it out.  And we come to an agreement then if -- and I was pretty frustrated, like I say, the attempt at producing the first well that he drilled that didn't produce water ended up filling it with cement and capping it after three days work, which never produced water.  The second well that I tried to attempt -- the bit I filled it with cement and had to start over.  So I was pretty frustrated.  So I made a deal with Mr. Walker.

Q.   And what was that deal?

A.   The deal was that Mr. Walker would come over and drill me three good water wells for the drilling rig.

Q.   And including the cost of getting that drilling

rig to you, what was the value of that drilling rig?

A. Well, I paid $75,000 for the drilling rig. I paid $5,000 for freight to get it shipped from Ohio down here and then I furnished all the material, as mentioned, you know, for the other wells. He was going to come drill the rig and set, you know, the casing and do all the work for me.

Q. Is it your opinion as the owner of the drilling rig that $80,000 is the correct market value of the drilling rig at that time?

A. Yes, sir, it was. Because I did an intense look, I was searching, pretty intensely, looking for a rig. And all the rigs that I found around the area, you know, around Houston, outside of Houston and all, they were about the same. I had to go up to Ohio to find what you might call a deal, for which I thought really was a pretty good deal for the rig. It only -- the truck had 10,000 miles on it. Everything worked. My brother-in-law went up there and it was demonstrated. He drilled a hole with it and showed us it worked and everything was good.

Q. Was it part of this agreement with Mr. Walker that you would pay for all the materials involved?

A. Yes, sir.

Q. Did Mr. Randall ask you paid -- excuse me, did

Mr. Walker ask to be paid hourly?

A. I'm sorry?

Q. Did Mr. Walker ask to be paid hourly?

A. No, sir. He didn't ask to be paid hourly. The deal was that he would drill me three good water wells for the drilling rig. And he would, you know, set the equipment and everything.

Q. How long did it take them, total time, they were on your property to drill the drilling of the last three water wells?

A. I want to say it took him -- them -- probably six days, you know, and --

Q. That's for all three wells?

A. Yes, sir. Six, seven days. Something like that.

Q. Do you believe the payment of $80,000 of a vehicle is a fair payment for six days work?

A. I believe it was, yes, sir. From what, like I say, my intentions were, eventually I was going to drill three wells and turn around and sell the rig. I had done it before with equipment. And made money back off of it. Which I would have come out ahead, unfortunately, this wasn't the case here.

Q. Did Mr. Walker accept your offer?

A. He did, sir.

Q. Did your offer include the depths of each well to

be drilled?

A. No. It didn't include the depth. There was some talk about the depth because, you know, I was in the process of moving back and forth from Houston. And, you know, during the conversation Herb had mentioned he had looked up on-line some depths of existing wells in the area, and I also had looked at some existing wells, and, you know, generally speaking, you know, it just -- it was a reference. But he mentioned that maybe two, two hundred fifty foot was probably good water, I mean, and I said, yeah, that's what it takes, you know, I needto get the good water.

Q. Were you relying on Mr. Walker's opinion as a licensed water well driller regarding any conversations of how deep the water well should go?

A. Well -- yes, sir. My experience in the past on wells I've drilled before I've never run into a situation where I couldn't -- we didn't -- the well that was drilled that you couldn't drink the water, you know.

Q. Did you ever drill those other wells by yourself?

A. No, sir. I never drilled any well by myself.

Q. So you always hired a licensed well driller to drill the wells?

A. Yes, I did. And as far as associating with -- in the business -- I'm a plumbing contractor. And wells

were drilled for builders.  And I was a plumber that tied onto the wells and ran the water to the house. That was my only dealings with the wells.

Q.  During the time where he was performing this agreement for the drilling rig, who came with him?

A.  Well, originally coming first time out was Herb Walker, his son, Tommy.  They drove a vehicle and they had started, you know, to drill the equipment.  The first well -- I wasn't around with they drilled the first well.  I was in the process of moving.  And I went back to Houston.  I come back and he had drilled the first well.  And he said, well, I got the first well. We hit water at 100 foot.  And, you know, he had already moved over to the second area, and was starting to drill there.  And he told me at the time, that he -- when he started drilling the second well, he got all the way down, I think 200 and something feet, and they were trying to place the casing and the casing broke off. And they had to replace the casing.

Q.  Let's go back to that first well they said they completed.  Did you have a chance to see the water coming out of that well?

A.  No, sir, not at that time.  No, sir.

Q.  Have you since?

A.  Yes, sir.

Q. What's the quality of the water?

A. The water is terrible. It's orange water. It's full of sand and dirt. You know, it's just, you know, it's unusable.

Q. Have you tried to use that water in different areas?

A. No, I haven't tried to use that water on that well.

Q. Did you try and spray it on the concrete?

A. That was the well that was suppose to be the good one for my new house that was took down 230 feet, and I was told that it was the good well that produced good water. I did tie it into my house and all my toilets were orange or just totally orange. Like orange juice. And I said, well, I can't do that. So, you know, I got me another well drilled.

Q. So -- so that first well -- let's stay one well at a time here. I think you're jumping ahead. It's water was unusable and you never tied into the house?

A. I did tie it into the house, but I disconnected it from the house because it was ruining my fixtures.

Q. I want to make sure we're still talking about the same well. We didn't jump ahead.

A. Yes, sir.

Q. When you were on the property, who did you see

operating the drilling rig?

A. Herb Walker operated the drill rig at all times. He was the only one that operated it.

Q. So you never showed up on the property and saw anyone else operating the drilling rig, beside Mr. Herb Walker?

A. Herb Walker was the only one that operated the drill rig. And his son, Thomas, was a helper. And later on his son, Adam, showed up from Corpus Christi had a little puppy with him and they showed up and he helped him a little bit.

Q. How many days do you think Adam Walker was there?

A. A couple of days.

Q. Did you request Adam Walker to come out?

A. No. I had no control of who came with Herb or who his help would be. And my deals were with Herb Walker.

Q. Did they complete a second well?

A. They did complete the second well after, you know, they completed drilling it, set the casing, and moved to the third well.

Q. Did you ever get a chance to see the water out of the second well?

A. I did, sir. That was the one that he took down 230 foot. It was moved up by close to the one that he

had drilled -- the first well, 100 foot. I observed -- when I come up -- come back from Houston -- and I noticed that one of his boys was over there drilling holes in the casing with a drill bit, and --

Q. And did you ask him about that?

A. I did, sir, because I furnished the material. I furnished the screen. I had took a sample of the sand to the well place. I got the material. They told me what size screen I would need. .006 I believe it was. And me seeing them drilling holes in it, I said -- he said, well, we do this all the time, you know. It's the way we do it. And I was concerned. And I asked him about it, and he said, well, we broke off the other pipe, we had to leave in the second well because we didn't have enough. He didn't call me and tell me, hey, I need some more screen, you know, to finish the well. I never got a call from him about what he needed until I come up and seen him drilling the holes and he had already drilled holes in the second well and put drilling it for the third.

Q. What kind of water did that well produce?

A. It produced the same dirty water. That just -- real nasty water, and it was so sandy it burned the first pump up that he furnished. I say he furnished. He furnished one little pump that I bought from him,

three-quarter horse, or half-horse it burned it right up. I mean the propellors in that sand it just tore it up.

Q. So you say he furnished it, what you really mean, you bought it from him?

A. I did buy it from him, yes, sir.

Q. And did they ever complete a third well?

A. They did. He did complete the third well. I was there most of the time on the third well when he was completing it.

Q. Who operated the drilling equipment?

A. Herb Walker operated the equipment at all times. I never seen no one else operate that equipment.

Q. Who gave instructions to Adam or Thomas?

A. Herb Walker. In fact, they got so mad at him one time giving orders, one got so mad went off into the trailer. And I went around the property and I found some teeth on the property, and I says -- had J. Walker on it -- and I said, J. Walker -- and I went up to him, he said, oh, that's my teeth. My boys got mad at me and they threw my teeth away. And I found them.

Q. So during the time of drilling the wells you were not giving anyone instructions on how to drill it; is that correct?

A. No, I was only given instructions on how to

operate the rig.

Q. You weren't telling them how to operate the rig; is that correct?

A. No. No. I never told them how to operate, how to drill, you know. He had been a licensed well driller. My experience with all the other licensed well drillers is they knew what to do. They had the same rules, or rules to go by, like I have, holding different licenses.

Q. Did Mr. Walker ever try to change the agreement with you?

A. No. He never tried to change it. He just didn't fulfill his part of the bargain and give me three good wells.

Q. Did he ever tell you that he defined good wells as being Tang colored wells?

A. No.

Q. And how was the water on the third well?

A. The third well was just as bad. It was terrible water. I got somebody else to -- another well company to come in to help me with this. I found out that Herb had been talking to --

Q. Real quick, that water, you said, terrible water. What do you mean?

A. I'm sorry?

Q. When you say, terrible water, what do you mean?

A. It was sandy, dirty, and just kind of blackish. If it sat, it would pump out stinky, nasty, black residue.

Q. And in your opinion, that's not a good well?

A. No, it's not a good well.

Q. Have you ever had any other well driller drill you a well like that and call it a good well?

A. No, never. In all the wells I've had drilled, I've always had good water.

Q. Did Mr. Walker explain to you that black, dirty, disgusting water was a good well?

A. No.

Q. Did he ever tell you orange Tang colored water was a good well?

A. No.

Q. And sandy water that burns up pumps is a good well?

A. No.

Q. So as far as you know, or your agreement with him was to drill three good wells, and none of these match any definition of good wells given to you by Mr. Walker?

A. No, they don't. I'm not using them. I have one hooked up right now to my irrigation system. I irrigate my lawn. This was suppose to be the good one by the

house and when I hooked it up to irrigate the lawn, it sprayed on my house -- it sprayed on my driveway and everything turned orange.  And so I had to go and remove all the sprinkler heads for that.  So I used it out in the pasture there to irrigate.

Q.  If you had to give a value to that well, that one well, for what it is worth to you, what would that value be?

A.  Really worth nothing to me.  I mean I could use the good well that I got somebody else to drill that took it down deep enough to get into good water, and, you know, I've got good, potable water.  It don't turn my toilets yellow.  It's good to drink.

Q.  How much money did you spend in -- let me back up.  You paid for the expenses on these wells, correct?

A.  Yes, sir.

Q.  So part of the agreement was not only to pay him, but you covered all the expenses of drilling the well?

A.  I'd cover the material, yes, sir.

Q.  Did you have any --

MR. SELLS:  Your Honor, I'd like to approach the plaintiff with what's marked as Plaintiff's Exhibit 3.

Q.  MR. SELLS:  Mr. Randall, we previously discussed that you are an owner and custodian of records for

General Plumbing; is that correct?

A. That is correct.

Q. And for your own records; is that correct?

A. It is, sir.

Q. Is Exhibit 3 a record of General Plumbing, or yourself?

A. Exhibit 3 is a record of a check written to Comanche Bit Services in the amount of $956.

Q. Before we get into what each individual piece -- generally, all the items contained there in Exhibit 3 are those records of your's or of General Plumbing?

A. Yes, sir, they are.

Q. Is this exhibit and these items kept by General Plumbing, yourself, in the general course -- in it's regular course of business?

A. Yes, sir.

Q. And is it the regular course of business of yours and General Plumbing for you or a representative of yours with knowledge of the act, event, condition to record, make a record, or transform the information made therein? I know it's a mouthful. I apologize, it's somewhat of a formulated question here. Is it the regular course of business for you or representative of yours, someone with knowledge of those actual events --

A. Yes, sir.

Q. -- to keep a record, to make a record of that information transmitted therein?

A. Yes, sir.

Q. Were these records made at or near the time or event that is recorded on them?

A. Yes, sir. They're dated. Yes, sir.

Q. Is this record the original or an exact duplicate of the original?

A. It is.

MR. SELLS: Your Honor, I offer plaintiff's Exhibit No. 3.

THE COURT: If you will show it to both. They have a copy.

MR. METCALF: I believe this is the exhibit we discussed before we started this morning so, I've got an objection.

THE COURT: Ladies and Gentlemen of the Jury, I know y'all came out here a little bit late, due to some fault of mine, but we've been out here since 9:00 o'clock, so I'm going to take a brief recess at this time. Please, it's very important, do not -- you have now heard some testimony, do not start your deliberations at this time. Do not discuss the case amongst yourselves or with others. We'll call you back in in just a little bit. They certainly can walk

around. I don't know if there's any smokers -- y'all certainly -- if there is, I'm not encouraging it -- but if you do, you certainly can go outside. With that I will call back in in just a little bit.

(Recess taken)

(Open court, parties present, jury out)

THE COURT: Y'all may be seated. All right, we're back on the record in 423-2441. Let the record reflect the parties are present with counsel, the jury is not present. Having taken a brief recess -- when we took the recess, plaintiff had offered Exhibit Number 3. So what's the situation, folks?

MR. METCALF: Your Honor, I have two objections. The first one, I think we've got an agreement on how to deal with at least a portion of it, so let me deal with that one first. My first objection is that Exhibit 3 is a compilation of documents. Some of those documents are from around the same time period as the events that have been testified to. And I have a separate objection to that. But I don't have an objection on the time period of those. There are other documents in there, though, that come from months or even a year or more after the fact. And so I told Mr. Sells when we were on break, I'm going to object to the relevance of those documents that came later.

Rather than putting the witness back on the stand and making him split it all out, we've agreed that plaintiffs will re-offer the same documents, but granulated a little bit so what the plaintiffs are offering as 3B, C, D, and E.

MR. SELLS:  And 3A.

THE COURT:  A is the remainder?

MR. METCALF:  I'm not going to have an objection to the time component of Exhibit 3A.  But 3B, 3C, 3D and 3E, these all refer to time periods after the defendants allegedly did the work and took the rig, and, therefore, I don't believe that they are relevant to the damages that have been pled for here.  I don't believe they match the plaintiff's testimony regarding expenses that he had related to these wells.  Since these all happened much after the fact.

MR. SELLS:  Our client's testimony continues that he and Mr. Walker were going back and forth about finishing out new wells to be able to get them to work. That former Exhibit mentioned that it was called in by Mr. Walker in July of 2012, the last page of it.  These were items that were prepared for Mr. Walker to do new wells, of course which was never done.  They were expenses our client paid based upon his agreement with Mr. Walker.

purchased, and bank statements identifying places where the equipment was bought.

Q. Are these documents too voluminous to be conveniently -- too voluminous -- are there too many of these documents for it to be easily examined by the Court?

A. Yes.

Q. Do Exhibits 3A, 3B, 3C and 3F, consisting of 19 pages, are the underlying documents for this chart, correct?

A. That is correct.

Q. Has this exhibit previously been produced to the opposing sides?

A. Yes, I believe so.

Q. How was Exhibit 8 prepared?

A. It was prepared by gathering together invoices and of the material that was -- it cost to put together the figures on the chart in Exhibit 8.

Q. Did you check the calculations on the exhibit after it was made?

A. I did, sir. I added them all up one by one.

Q. You verified it by adding them and checking to make sure they were accurate?

A. I did, sir.

Q. So would you say is Exhibit 8 an accurate chart

of the underlying documents?

A. Yes, it is.

Q. Including your testimony as to the value of the rig?

A. Yes, sir, it is.

MR. SELLS: Your Honor, I offer Exhibit 8 for the record.

THE COURT: All right. Based on the previous rulings, go ahead, Mr. Metcalf.

MR. METCALF: I thought you already admitted it, Your Honor.

THE COURT: Well, whether I did or not, based on my previous rulings, the Court will admit Plaintiff's Exhibit Number 8.

Q. MR. SELLS: According to Plaintiff's Exhibit Number 8, Mr. Randall, what is the total amount of expenses you paid?

A. Yes, sir.

Q. What is the total amount of the expenses you paid to help Mr. Walker keep up his end of the agreement?

A. $9,596.06.

Q. Are you seeking those damages from the Court today?

A. Yes, I am.

Q. And what was the value of the rig that you gave

Mr. Randall in payment for his supposed completion of the agreement?

A. Mr. Walker. Yes, sir.

Q. Pardon me. That you gave Mr. Walker, correct.

A. $80,000.

Q. What was the total amount in actual damages you are seeking from Mr. Walker for his breach of the agreement to drill you three good water wells?

A. $89,596.06.

Q. And that all consists of money you personally had to pay at one time or another, whether it be purchasing the rig or purchasing materials, the equipment, correct?

A. That is correct.

Q. Has Mr. Walker given you payment of any of that amount? Has he paid you any amount towards that balance of damages?

A. No, sir, he hasn't.

Q. Mr. Randall, are you also seeking your attorney's fees here today?

A. Yes, I am.

Q. Were you required to hire an attorney to help prosecute your claim against Mr. Walker?

A. I was, yes, sir.

Q. Did you hire myself and Mr. Welscher for this?

A. I did, yes, sir.

Q.   And you are asking the Court here today for your attorney's fees; is that correct?

A.   Yes, sir, I am.

Q.   Did you at any time ask Mr. Walker to come and fix the water wells?

A.   I did, sir.

Q.   Did he ever fix them?

A.   No, he never fixed them.

Q.   Just to reiterate for the jury the agreement you made with Mr. Walker was for him to drill you --

MR. JENKINS:  Objection.  He's leading the witness.  He's been leading the witness.

THE COURT:  All right.  Sustained.  Rephrase your question.

Q.   MR. SELLS:  Could you repeat for the jury your agreement with Mr. Walker.

A.   My agreement with Mr. Walker was to come and drill me three good water wells on my property.  And for doing the work of drilling the wells and completing them I was to give him the drill rig.

Q.   Did he accept the agreement?

A.   He did.

Q.   Pass the witness, Your Honor.

THE COURT:  All right.  Mr. Metcalf.

CROSS EXAMINATION

Q. MR. METCALF: Mr. Randall, if I -- if I understand your testimony correctly, you're telling the jury that you had an agreement with Herbert Walker?

A. That is correct.

Q. You're telling the jury now that you never had an agreement with Adam Walker or Tommy Walker?

A. No, sir. I never had an agreement with either one of them.

Q. The only agreement you ever had, based on your testimony today, was with Herbert Walker?

A. That is correct.

Q. Mr. Randall, this isn't the first time you and I have spoken with you under oath about this case, is it?

A. No. We spoke in the deposition. Yes, sir.

Q. Do you recall coming to my office and I was able to ask you some questions at that time?

A. I believe so, yes, sir.

Q. And you swore the same oath then that you swore today.

A. I did, yes, sir.

Q. To tell the truth the whole truth, right?

A. That is correct.

Q. Not to leave anything out.

A. No, sir.

Q. So let's talk about what you say the terms of

your agreement -- what those terms are, Mr. Randall. You say that you agreed that Herbert Walker would drill three wells?

A. That is correct.

Q. Right. Now, you also said in the past that the agreement was that they would be three potable water wells; isn't that right?

A. No. Potable water -- drinking water wells, yes, sir.

Q. So it's your testimony today that y'all's agreement wasn't for good water wells, it was for potable water wells?

A. Well, to me good and potable water is the same thing. Yes, sir.

Q. It is? Okay. Now, you agreed at the time -- your testimony is that the wells would each have to be 250 feet deep; isn't that right?

A. That's what I was told by Herb. Looking at charts, that that's probably where the good water was.

Q. Mr. Randall, let me ask the question again. One of the essential terms of your agreement with Herbert Walker was that those wells would be 250 feet deep; isn't that true?

A. No, sir, it's not true.

MR. METCALF: May I approach, Your Honor?

THE COURT:  Yes, sir.

Q.  MR. METCALF:  Mr. Randall, I'm handing you a copy of the transcript of that deposition that you gave back -- it was October of 2013.

A.  Yes, sir.

Q.  I'd ask if you would turn with me to page 83 of that deposition.

A.  Okay.

Q.  Now, just to be clear, you were under oath when you gave these answers; isn't at that right, Mr. Randall?

A.  That's correct.

Q.  After you gave these answers and the court reporter prepared the transcript, you had a chance to review it and make any changes, didn't you?

A.  Yes, sir.

Q.  So we can rely on whatever you said back in October of 2013, can't we?

A.  Yes, sir.

Q.  Mr. Randall, I'm going to read from lines 18 through 20.  I want you to follow along, make sure I get this right.  We were talking about the terms of the agreement.  And you said --

MR. SELLS:  Objection, Your Honor.  Improper predicate for impeachment.  He's introducing this for

impeachment purposes and he hasn't done any improper foundation of that.

THE COURT: All right. Overruled.

Q. MR. METCALF: Back in October 2013, Mr. Randall, you said, quote, "He was going to take them down about 250 feet was the agreement." Did I read that right?

A. Yes, sir.

Q. Now, you did say about 250 feet. So --

A. Well, I mean that's what I was told by him. The water -- I mean, I didn't know where good water was or not. It's him that said he looked at a lot of the wells in the area and I kind of casually went along with him and said, yes, you know, 250 foot, good water. That would be fine.

Q. So the explanation you got for the jury now, over a year after you gave this testimony, is that it was Herb's idea that he told you it needed to be 250?

A. Yes, sir. He said it was about 250 was the good water.

Q. Mr. Randall, would you look down at line 25. I'm going to turn the page while I'm reading this time. I asked you, So it's your testimony now that the agreement was that there were going to be three good wells that were going to be at least 250 feet deep? You answered, right.

A. Well --

Q. Did you say anything in there about Herb told me that's where the water was?

A. But that's how we came up -- I come up with it. Herb was telling me what he thought was going to happen. Just like he drilled the well 60 foot and then the other one 100 foot. And I still assumed I would have good water. You know, that was just something that Herb was telling me as a well man. I mean --

Q. So it's your testimony now that 250 feet -- that that term -- that maybe there was some confusion about it?

A. Sir, if he would have drilled 250 foot and got me good water, I wouldn't be here today.

Q. Because that was a term of the agreement, according to you?

A. That was terms of the agreement was to give me good water. Potable water.

Q. Now, there's also a term of the agreement that Mr. Walker was going to set the tanks and pumps on each well; isn't that right?

A. That was correct.

Q. That's not something we heard from your lawyer in opening statement, or from you on your testimony just a minute, okay, but that was a term of your agreement;

wasn't it?

A.   He was going complete the wells, yes, sir.

Q.   He was going to set the tanks and the pumps on each well.

A.   Yes, sir.

Q.   And it's your testimony in exchange for doing that, for drilling three wells, guaranteeing potable water, drilling each 250 feet deep, and setting the tanks and pumps on each well -- in exchange for those things -- Mr. Walker doing those things, you would sign over your drilling rig?

A.   That was the agreement, yes, sir.  That I sign it over to him if we had the good well and good water. Yes.

Q.   And it's your testimony that these are terms Herbert Walker expressly agreed to?

A.   Yes, sir.

Q.   There's no doubt in your mind that he knew what was expected and he said yes?

A.   There's no doubt in my mind, yes.

Q.   At least there's not sitting here today?

A.   There was never.

Q.   Well, when you were talking about these terms, these are terms that y'all discussed over the telephone, right?

A.   Yes, sir.

Q.   And several different conversations, right?

A.   I'm not understanding, several different conversations.  We had one conversation making the agreement.  We had other conversations about him assisting me running the rig.  It wasn't several conversations that we talked about him coming down.  It was one conversation.

Q.   And it was on the basis of that one telephone conversation that you're telling this jury now that y'all were on the same page?

A.   That is correct.

Q.   Mr. Randall, please turn over to page 85 in your deposition.  Now, you just told this jury that you've never thought that there was any confusion.  But if you start reading on line 25, I ask, does it appear to you now that y'all weren't on the same page?  And your answer, Evidently, yes, sir.  So back in October of 2013, some fourteen or fifteen months ago, you knew that y'all weren't on the same page; isn't that right?

A.   Well, maybe so.  I mean I didn't get what I was suppose to have got.  So something was wrong.  He left me with the wells like they were.  I had to hire somebody else to come and drill one.  Wouldn't you say something was wrong?  I'm sorry, sir.

THE COURT: I'm going to interject, Mr. Randall, you don't get to ask Mr. Metcalf questions.

THE WITNESS: Sorry, Your Honor.

THE COURT: You're fine. You just don't get to ask him questions. Go ahead, Mr. Metcalf.

Q. MR. METCALF: Now, Mr. Randall, would you agree with me, part of the reason you weren't on the same page is because nobody ever wrote anything down?

A. We had an understanding. It was never questioned to me whether or not he understood. I mean his full intention was to do what he was paid to do. And my full intentions were to pay him, give him the rig, if he had done what he'd said. And if he would have even backed it up, which he didn't.

Q. Mr. Randall, you never wrote a word of this down anywhere, did you?

A. No, I did not write nothing down, no, sir.

Q. Even though you know from your many, many years of acting as a contractor, you know how important it is for a contractor to have a written contract, don't you?

A. Yes, sir. I've been in business for a long time, but I've done jobs for people before where they're yes or no. I've done -- not always a contract. I mean sometimes people's yes and no, I trust them.

Q. Mr. Randall, the truth is you can't even remember

the last time you did a job for somebody without a written contract, can you?

A. Well, not really, sir. But I've done it in my business. Like I say, I've done quite a few jobs for people without a contract.

Q. Quite a few jobs for people without a contract?

A. Yes, sir, I have.

Q. Mr. Randall, please turn over to page 37 in your deposition. Page 37, I'm going to start reading on line 22, and correct me if I get any of this wrong. I asked you, You usually have a contract with those individuals as they come. And you said, Yes, sir. And I said, Do you ever do work where you don't have a contract -- a written contract? And you said, There's been times with a verbal contract. And so then I asked you, When was the last time General Plumbing Contractors, Inc. did a job where there was not a written contract? And your answer was, I can't remember that. I mean it's been a while. There's little jobs that come up where, you know, a friend or something would have something. You go take care of it for them, or so, and no contract. It's just something to help somebody out or so. Did I to read that right?

A. You read it right. I do that, too. I'll help people out. And like I say, it's no contract with it.

# ii.

# EXCERPTS OF EXAMINATION OF HERBERT WALKER

MR. SELLS: I don't believe we have any special issues -- not for us.

MR. JENKINS: None, Judge.

THE COURT: All right. Bring them in. Thank you, Mr. Gary.

(Open court, parties and jury present)

THE COURT: All right. Y'all can be seated. Thank you.

Mr. Sells, the plaintiff may call it's next witness.

MR. SELLS: The plaintiff calls Mr. Herbert Walker.

THE COURT: Mr. Walker, if you'll come forward, please, sir. If you'll raise your right hand, sir.

(Witness was sworn by the Judge)

HERBERT WALKER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

THE COURT: All right. If you'll have a seat.

MR. METCALF: Your Honor, so everybody's aware, I think the Court knows, Mr. Walker has been having some hearing aid issues. I think he's given up and taken the hearing aid out, altogether. But if we

need more volume, it's an issue we have been having all day.

THE COURT: All right. I have volume for Mr. Walker's microphone. I don't have microphones for y'all. So, Mr. Sells, please try to speak up. Mr. Walker, if you have any difficulty hearing, you let us know. All right.

THE WITNESS: Thank you, sir.

THE COURT: Yes, sir.

Q. MR. SELLS: I don't usually have a problem being loud. Can you hear me okay like this?

A. Yes. Yes, sir.

Q. Am I yelling too much?

A. No, you're fine now.

Q. Okay. Would you please state your name for the jury.

A. Herbert J. Walker.

Q. Do you have a license as a water well driller?

A. Yes, sir.

Q. How long have you been licensed as a water well driller?

A. Started along in '66. 1966 is I think when I first acquired my license.

Q. Have you ever been reprimanded for having too much sand in the water?

A.   Yes.

Q.   So you understand that having too much sand in the water is an issue?

A.   Depends on the application.  Yes, sir, it is an issue.

Q.   Do you consider the idea of a good water well to be complicated?

A.   Yes, sir.

Q.   Did you tell Mr. Randall you were planning on drilling non-potable water wells?

A.   One more time.

Q.   Did you tell Mr. Randall that you planned on drilling non-potable water wells?

         MR. METCALF:  Your Honor, I'm going to object.  I believe that questions is argumentative.  I think it's been our position all along that he never planned on drilling any wells.  So I think that question assumes something we disagree with --

         THE COURT:  All right.  I'll overrule that objection.  You can answer the question.

Q.   MR. SELLS:  Did you ever tell Mr. Randall you planned on drilling non-potable water wells?

A.   I'm not really understanding the question.

Q.   Do you understand the term non-potable?

A.   Yes, sir.

Q.   Did you instruct -- did you go and assist to drill water wells on Mr. Randall's property?

A.   That's a different question.

Q.   Yes, it is.  I'm going to help you understand the first one, but it might take a couple questions to get there.  Did you go to Mr. Randall's property and assist the drilling of three water wells?

A.   Assisted, yes, sir.

Q.   Did you take the lead on the drilling of three water wells?

A.   No, sir.

Q.   Did another licensed water well driller take the lead on the drilling of the three water wells?

A.   No, sir.

Q.   So who led the drilling of the three water wells?

A.   Mr. Randall.

Q.   And it's your testimony that he hired you and your sons, but knew how to do it himself?

A.   He did not hire me to drill any water wells.

Q.   Do you know the difference between potable and non-potable water?

A.   Yes, sir.

Q.   Do you commonly drill water wells for non-potable water?

A.   I drill water wells to produce water.  The

potable part is -- the potable part of water is whether it's drinkable or not. Some wells, yes, potable. Some no. But I never enter into agreements to provide potable water every time -- any time. We just do not guarantee potable water. No one can. Is that --

Q. Did you tell Mr. Randall that these wells were not going to be potable water?

A. I didn't tell him they weren't going to be.

Q. Are you a licensed well driller?

A. Yes, sir.

Q. Do you think that distinction is important?

A. If that is their desire, I wouldn't attempt to drill potable water.

Q. Did he tell you he wanted non-potable water?

MR. JENKINS: Your Honor --

A. Maybe the non-potable part is what I'm not understanding.

THE COURT: Mr. Walker, hold on.

MR. JENKINS: Asked and answered is the objection.

THE COURT: All right. I'll overrule that. If you'll ask the question again, please.

Q. MR. SELLS: Would you mind repeating the question for him? You may be closer there.

COURT REPORTER: Did he tell you he wanted

non-potable water?

A.   No, he did not.

Q.   Do you broker the buying and selling of drilling rigs?

A.   No, sir.

Q.   Did Mr. Randall contact you about the buying and selling of drilling rigs?

A.   Yes, sir.

Q.   Were you buying and selling your own drilling rig?

A.   No, sir.

Q.   Were you brokering the sale of a drilling rig?

A.   I have brokered the sales.

Q.   So when you said you don't broker the sales, was that truthful?

A.   Yes, sir, that's truthful.

Q.   How did you split that one?

A.   I locate equipment.

Q.   So I'm trying to help the jury understand why you were being truthful when you said you don't broker them, but you broker them?

A.   You asked me, did I broker them.  This is -- I have.  But this is not my profession -- as a locator/broker -- the definition of broker is they buy and sell.  I locate that equipment for the buyer and the

seller. I'm not the man that puts the money up, buys it, sells it. I'm the guy that they look to if they're looking for a certain rig.

Q. Did Mr. Randall give you the title to the rig in question?

A. No, sir.

Q. Is it your contention that you received none of the funds from the sale of that rig?

A. I did not receive anything.

Q. Who is it your testimony that the rig was given to?

A. The title rig was given to Adam Walker.

Q. Is there a difference between the title and the rig?

A. The title -- yes, sir, a piece of paper. And a piece of equipment.

Q. So did the rig, itself, go to someone other than Adam?

A. The rig? Mr. Randall gave Adam the title and the rig.

Q. So you're just trying to draw distinction for what reason?

MR. METCALF: Your Honor, I'm going object to that.

THE COURT: All right. Rephrase your

question, please.

Q.   MR. SELLS:  So when I asked you, did he give the rig -- who did he give the rig to, why did you respond with the title and not the rig?

A.   I assumed that title and the rig is the title part of the rig.

Q.   Did you fill out well reports for the wells drilled on Mr. Randall's property?

A.   Yes, sir.

Q.   Who did those well reports state were the drillers?

A.   The report that I fill out -- I filled it out with my name on them as the licensed driller.

Q.   Were those reports filed with the State of Texas?

A.   Yes, sir.

Q.   Did you operate the drilling rig in question on Mr. Randall's property?

A.   Yes, sir.

Q.   How deep was the first of the three wells?

A.   I don't recall.

Q.   If I was to tell you it was 110 feet, would you know if that was any different?

A.   I wouldn't know if it was any different.

Q.   Do you remember the quality of water produced by that well?

A. No, sir.

Q. So you can't testify today that it produced something other than iron-laden water?

A. That's the testimony I've heard.

Q. And you can't contra --

A. I cannot contradict it, yes, sir, you're right.

Q. Do you know the quality of the water produced by the third well?

A. No, sir.

Q. So you can't contradict the testimony that it produces a lot of sand?

A. I cannot contradict it.

Q. Do you know if the second well had holes drilled in the casing?

A. Yes, sir.

Q. So it is your testimony that holes were drilled in the casing of the second well?

A. Yes, sir.

Q. Is that allowed by the State?

A. Yes, sir.

Q. Are there any requirements that you get something in writing from the landowner before you're allowed to do that?

A. Yes, sir.

Q. Did you do that?

A.   Did I do what?

Q.   I asked you if you got in writing from the landowner that you're allowed to put homemade holes in the casing.  You said, yes.  And you also stated, if I'm correct, that it requires a signature from the landowner.  My follow-up question was, and still is, did you get that in writing from the landowner?

A.   No, I did not.

MR. METCALF:  Your Honor, I'm going to object.  That question misstates the testimony.  This witness never testified that he drilled any holes in any casing.

THE COURT:  All right, the jury will recall the testimony from the witnesses from the witness stand.

Q.   MR. SELLS:  So if you didn't get it in writing, how was it allowed by the State?

A.   One more time?

Q.   If you didn't get the landowner's signature allowing you to drill your own holes in the casing, or for someone to drill holes in the casing, how is it allowed by the State?

MR. METCALF:  Again, Your Honor, I'm going to object.  This is one of those, when did you stop beating your wife?  The question pre-disposes something he's already denied.  He says he wasn't the one who

would be an appropriate curative instruction. So we would appreciate that.

THE COURT: But the plaintiff is permitted to go back and ask, did you drill holes? Did you not drill holes? Did you get it in writing? I will allow all that. But I will not allow, is that a violation of State law? So I will do that. The plaintiff is permitted to go back and do that -- those line of questions. But if I hear that violation of State law, or reprimanded, is it sandy water, good water -- y'all can ask all that, but have you been reprimanded for that -- jeepers -- all right. All right. Bring them in.

(Open court, parties and jury present)

THE COURT: All right. Y'all maybe seated. All right, Ladies and Gentlemen of the Jury, I'm going to ask that you disregard the last bit of question and answer, and I'll allow the plaintiff to proceed. Go ahead, sir.

Q. MR. SELLS: Did you have to drill holes in the casing of the water well with a hand-held drill?

A. Yes, sir.

Q. Did you get the home owner's approval of that?

A. No, sir.

Q. Is it your contention that the 1978 International

drilling rig never existed?  Did you understand the question?

A.  No, sir.

Q.  Did Terry Randall have a drilling rig?

A.  Yes, sir.

Q.  Did you use that drilling rig?

A.  Yes, sir.

Q.  So you have no dispute with the existence of the drilling rig?

A.  The drilling rig belonged to Mr. Randall.  Yes, sir.  No dispute.  When you tell me, no dispute, makes me wonder is that a yes or a no?  So you're kind of confusing me some.

Q.  Do you agree it existed?

A.  Yes, sir.

Q.  And you agree you used it?

A.  Yes, sir.

Q.  Do you agree that it was paid to either you, Adam, or Thomas for work done on his property?

A.  Yes, sir.

Q.  What do you believe the value of the drilling rig was?

A.  About $40,000.

Q.  Is it your contention -- let me rephrase that.

A.  Thank you.

Q. Do you believe that if there's any trouble with the wells it was caused by your sons?

A. No, sir.

Q. Who do you blame for the wells?

A. If I blame?

Q. If there was any problem with the three wells in question, who do you believe was responsible for drilling them correctly?

A. We were. Yes, we were responsible for correct drilling.

MR. SELLS: Pass the witness, Your Honor.

THE COURT: All right. Mr. Metcalf, being that that's your client, you may either ask questions of your client now or defer at a later time.

MR. METCALF: I prefer to reserve for our case, Your Honor.

THE COURT: All right.

MR. JENKINS: I can wait as well, Judge.

THE COURT: All right. You may step down, sir.

MR. SELLS: Your Honor, we like to call Mr. Thomas Frist.

THE COURT: Come forward, please, sir.

(Witness was sworn by the Judge)

THOMAS FRIST,

# iii.

# EXCERPTS OF EXAMINATION OF TOM FRIST

Q. Do you believe that if there's any trouble with the wells it was caused by your sons?

A. No, sir.

Q. Who do you blame for the wells?

A. If I blame?

Q. If there was any problem with the three wells in question, who do you believe was responsible for drilling them correctly?

A. We were. Yes, we were responsible for correct drilling.

MR. SELLS: Pass the witness, Your Honor.

THE COURT: All right. Mr. Metcalf, being that that's your client, you may either ask questions of your client now or defer at a later time.

MR. METCALF: I prefer to reserve for our case, Your Honor.

THE COURT: All right.

MR. JENKINS: I can wait as well, Judge.

THE COURT: All right. You may step down, sir.

MR. SELLS: Your Honor, we like to call Mr. Thomas Frist.

THE COURT: Come forward, please, sir.

(Witness was sworn by the Judge)

THOMAS FRIST,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

THE COURT:  All right.  Thank you, sir.

Q.  MR. SELLS:  Could you please state your name for the jury.

A.  Thomas Frist.  F-R-I-S-T.

Q.  You're currently retired; is that correct, Mr. Frist?

A.  That's correct.

Q.  What was your previous employment?

A.  As far as being a water well investigator, I worked for TDLR for fifteen years.

Q.  Could you explain to the jury who TDLR is?

A.  Texas Department of Licensing and Regulation. They're an occupational agency that they have -- they regulate things like boxing, cosmetology, barbers, water well drillers, electricians, and a few others.

Q.  Did you investigate water wells as part of your previous profession?

A.  Yes.

Q.  For how many years did you do that?

A.  Fifteen.

Q.  Do you believe that fifteen years of experience makes you an expert as to water wells?

A.  I guess you could say that.

Q.   When did you first come in contact with the wells in question here today?

A.   It was Mary Ellen Mercer (phonetically) who was an enforcement investigator, contacted the water well driller's program, and asked us to go out there.  And myself and W.L. Stribling (phonetically) who was the program manager, went out there.  And I think it was sometime around maybe November or December.

Q.   During this fifteen years, what were your duties?

A.   My duties were to do consumer complaints, abandon water wells, and catch illegal drillers and pump installers that weren't licensed.

Q.   Was part of your job duties including inspecting water wells?

A.   Yes.

Q.   Did you ever inspect the water wells in question?

A.   Yes, I did.

           MR. SELLS:  Your Honor, I'd like to approach him with what's been marked as Plaintiff's Exhibit 4.

           THE COURT:  Yes, sir.

Q.   MR. SELLS:  You've been handed what's been marked as Plaintiff's Exhibit 4; is that correct?

A.   Yes.

Q.   Exhibit 4 is collection of nine figures -- nine images.  Are you familiar with the items in these

pictures?

A. Yes, I am. I'm the one that took the pictures.

Q. Are these pictures an accurate depiction of the items contained therein?

A. Yes, they are.

MR. SELLS: Your Honor, may I publish these? Or we offer Exhibit 4.

MR. METCALF: No objection.

MR. JENKINS: No objection.

THE COURT: All right.

MR. SELLS: May I publish a copy of these to the jury?

THE COURT: As soon as I make ruling, yes, sir. Plaintiff's Exhibit Number 4 is admitted.

Hold on, Mr. Sells, are those -- I just saw you hand those to Mr. Gary. Is that a separate exhibit?

MR. SELLS: It's a copy of the exhibit that I handed to --

THE COURT: Well, those are the ones that were admitted. So if you're doing to publish a copy, we got the ones that are admitted will be published to the jury, not a copy of -- or anything like that. So those may be published. If you want to show the witness a copy of it, that's fine. But whatever gets admitted is what goes to the jury. I appreciate you trying to be

efficient, but that's how we do things.  So --

Q.  MR. SELLS:  Are you familiar with Exhibit Number 1?

A.  You me figure 1?

Q.  Figure 1 of Exhibit 4.

A.  Yes, I am.  It looks like it was Well Number 3, the last well they drilled.

Q.  Okay.  Your inspection of this well, do you remember what it revealed?

A.  That well produced sand.  Normally we would dig underneath that slab, and as big as that slab is, we couldn't do that.

Q.  What do you mean by produce sand?

A.  You dig down underneath the slab all the way to the water well casing to see if there's angular cement present.

Q.  Real quick, you said produce sand.  Does that mean the water, as it came out, came out with sand in it?

A.  What we did when we were out there, we test all three wells.  We take three samples.  The first sample is immediately.  The next sample is thirty minutes after.  And the final sample is one hour.

Q.  And that's while the water is flowing continuously throughout those time periods?

A.   It will give you a good cycle of what the well is doing.

Q.   Did you see sand in that water?

A.   Yes, we did.

Q.   Did you find that it had more sand that you would consider a good water?

A.   For a domestic well, yes.

Q.   Are you familiar with what's been labeled figure 2 of the Exhibit 4?

A.   Yes, this is the -- where the water was going from Well Number 1, as you can tell, the water has a yellow ting -- an indication of a high content of iron.

Q.   Would you consider water with that high content of iron to come from a good well?

A.   No.  It's probably non-potable.  Which means it's harmful to plants and animals.

Q.   Are you familiar with figure three of Exhibit 4?

A.   Figure three is the well that was located at the house -- where the future house was going to be.

Q.   Is that you in figure three?

A.   No, that's W.L. Stribling, the project manager.

Q.   You guys both have the same mustaches.

A.   It wound up that away.

Q.   Which well did you say this was again?

A.   This is Well Number 3.  I mean this is Well

Number 2.  Which is the well for the house.

Q.  Did you find the water that came out of Well Number 2 to be good water?

A.  It had sand it in, also.

Q.  Was it -- did it have more sand than was necessary -- or that you would consider good for use in a house?

A.  Shouldn't have any sand coming in.

Q.  Let's go to exhibit, or -- sorry -- what's been listed as figure number 4.

A.  Okay.

Q.  Can you tell us what we're looking at here?

A.  What you're seeing there, kind of the blue looking things, that's where the casing was drilled and that's the shavings off the casing.

Q.  Is it -- is there something wrong with drilling holes in the casing?

A.  We don't allow it.  The State doesn't allow it. What that does is -- the reason that the rule was put in --

THE COURT:  All right.  Hold on, sir. Ladies and Gentlemen, there's a matter I need to take up outside your presence.  So I apologize.  But please do not discuss the case amongst yourselves or with others.

(Open court, parties present, jury out)

question.  Whichever you want me to do.  Draw attention to it or not draw attention to it.

MR. JENKINS:  I want a limiting instruction, if it's up to me.

MR. METCALF:  We will tag along.

THE COURT:  I'm just go going to ask them to disregard the last answer by the witness.

Is there any question about my rulings?

THE WITNESS:  No.  I've just got to be careful.

THE COURT:  Start quoting Cool Hand Luke real soon, failure to communicate.  Bring them in.

(Open court, parties and jury present)

THE COURT:  All right.  Y'all can be seated. All right.  Ladies and Gentlemen of the Jury, I'm going to ask that you disregard the last answer by the witness.  Mr. Sells, you may continue, sir.

Q.  MR. SELLS:  Mr. Frist, does drilling holes in the casing allow sand into the water?

A.  Do what now?

Q.  Does drilling holes in the casing allow sand into the water?

A.  Yes, it does.

Q.  On figure Number 5 of Exhibit 4, there appears to be an annotation on there with an arrow pointing to

something that looks to me to say, sand.  Do you see that?

A.  Yes, I do.

Q.  Did you write that on there -- in your handwriting?

A.  Well Number 5?

Q.  Figure 5.

A.  Figure 5, Well Number 3.  Yes, I did.

Q.  Is this sand we see in the picture from the well water?

A.  Yes, it is.  It's sand that was pumped out of the well.

Q.  Figure 9, in your expert opinion, is this appropriate materials to be used for drilling a well?

A.  Which one are we talking about?

Q.  Figure 9.  In your expert opinion, is this the appropriate materials to be used in drilling a water well?

A.  No, it is not.  The gravel should be uniform, pea size.

Q.  In your opinion were the three wells drilled by the defendants good water wells?

A.  As far as what classification?

Q.  Were they what you would refer to as a good water well?

A.  A good domestic well?

Q.  Yes.

A.  No.

MR. SELLS:  Pass the witness.

THE COURT:  All right.  Mr. Metcalf.

CROSS EXAMINATION

Q.  MR. METCALF:  Mr. Frist, I imagine we all have the same question right now, what other kind of well is there?  You said a good domestic well.  What other well is there?

A.  There's an irrigation well.  There's ejection wells.  There's several different other kinds that I can't remember right now.

Q.  That irrigation well that you mentioned, does it mean something different for a well to be a good well if it's being used for irrigation?

A.  Irrigation wells are basically drilled to produce as much water possible, regardless of what's coming out.

Q.  And you were asked if these were good water wells.  And you had to qualify your answer that they're not good domestic wells.  Would they be good wells for a different purpose?

A.  Probably.  Not necessarily the first one.

Q.  In fact, at least one of them is a good irrigation well; isn't it?

A.   Well, I don't think it would last very long.

Q.   At the time that you went out to the property in October of 2012, was Mr. Randall using one of the wells to irrigate his pasture?

A.   As far as I know, no.

Q.   Would it surprise you to learn that he told the jury this morning that he is in fact using one of the wells to irrigate his pasture?

A.   I'm surprised it's lasted that long.

Q.   You said that you're retired.  So I want to make this clear, you're not here today representing the Texas Department of Licensing and Regulation, are you?

A.   No, sir.  No.

Q.   You're here today because Mr. Randall has hired you and asked you to come here; is that right?

A.   Correct.

Q.   You're being paid by Mr. Randall for your testimony?

A.   Correct.

Q.   You told the jury that you were inspecting wells for fifteen years before retirement?

A.   Yes.

Q.   And you believe that makes you an expert?

A.   I guess.  If that's your opinion, fine.

Q.   I'm asking you if that's your opinion?

A. I guess I'm an expert because there's not many people can do it.

Q. You know that Mr. Walker's been drilling wells for almost sixty years, don't you?

A. I wouldn't know. I know he's had a license for a while, but that doesn't mean he's been drilling.

Q. In response to looking at one of your pictures, looking at the picture you said you could tell that that water was probably non-potable. Do you recall that?

A. Yes. The water was checked by Mr. Stribling and it had --

Q. And Mr. Frist, I don't want you tell us what somebody else might have done. If Mr. Stribling has something to add, he can come in and testify. I want to know what you know. Do you know if the water was potable? Did you do anything to check it?

A. I helped him do the testing.

Q. Okay. So you helped somebody else do the testing?

A. Yes, we did it together.

Q. And based on that, you're telling the jury that it's probably non-potable?

A. It's above a 3.0 on iron. Which is not good for humans.

Q. Are there ways to remove iron from water after

it's out of the ground?

A. An iron filter.

Q. So you can put a filter on this well and the water would be okay?

A. It would pretty expensive to use.

Q. In fact, there are lots of things that can be done to develop a well that's having issues, aren't there?

A. Yes.

Q. You can let it run, and that may run out some of the sand and other matter.

A. Well with the holes in the casing, I highly doubt that it would ever be corrected.

Q. Mr. Frist, I'm not asking you if it would work on this well. I'm just asking generally, when you've got a water well and it's got issues, there are -- one of the things you can do to try to correct those issues is you can let it run.

A. True.

Q. You can -- you can blast it out with compressed air?

A. That -- I think that I think that was tried out there.

Q. Mr. Frist, it's a yes or no question. Is that something that can be done to improve the performance of

a well?

A.   It can be used to improve it.

Q.   You can even -- I think you could put dry ice down the well.

A.   I've never heard of that.

Q.   Mr. Frist, are you familiar with the Texas Well Owner's Network?

A.   No.

Q.   That's not a group you're familiar with in your fifteen years of inspecting wells?

A.   No.

Q.   And you said that you've never heard of the recommendation that well yields can be increased by dropping dry ice into the wells?

A.   Never heard that before.

Q.   Carbon dioxide bubbles up and makes the water more acidic which can dissolve some scaling and kill bacteria.  Things like that.

A.   Never heard of that.

Q.   Do you know anything about scrubbing a well?

A.   Yeah.

Q.   That's something that can be done, right?

A.   It can be done.  It can be tried.

Q.   You were on Mr. Randall's property how many times?

A.   Once.

Q.   So in October of 2012 that's the only time you've been out there to see these wells?

A.   Correct.

Q.   Anything that you know about what happened before that, it's based on things that Mr. Randall told you.

A.   I interviewed Mr. Randall before I even looked at any of the wells.

Q.   So everything that you know about this is at least based in part on what Mr. Randall told you?

A.   Correct.

Q.   So you don't know, other than when he might have told you, you don't know what if anything was done to develop these wells, do you?

A.   I know Mr. Odom was contacted to try to come out there and straighten the well out.  He's a licensed driller, I believe in Bastrop.

Q.   That's something you know because somebody else told you that, right?

A.   No.  I got a statement from Mr. Odom saying what he did out there.

Q.   And, Mr. Frist, Mr. Odom -- we've heard his name a couple of times today.  He actually told you at one point, didn't he, that he could have drilled all three of the wells for $22,000.

A. Correct.

Q. Certainly not $80,000, is it?

A. Yeah. Sure is.

MR. METCALF: I pass the witness.

THE COURT: Mr. Jenkins.

CROSS EXAMINATION

Q. MR. JENKINS: Mr. Frist, can you tell me what an alluvial well is?

A. An alluvial well is a natural well similar to a spring that comes up out of the ground naturally.

Q. Does it mean shallow? Does alluvial mean shallow?

A. It could be deep. San Antonio has quite a few of them.

Q. And are you familiar with the aquifers underneath Mr. Randall's property, in this area in general?

A. I didn't check on them. I mean as far as looking at the map and all.

Q. Is the water from an aquifer like Carizzo or Simsboro going to be of a better quality than a shallow well next to the river?

A. Should be.

Q. The water will be better out of the aquifer -- cleaner?

A. Should be.

# iv.

# EXCERPTS OF EXAMINATION OF S. CORY SELLS

THE COURT: You're free to go, sir.

MR. SELLS: Your Honor, I call myself to produce testimony as to attorney's fees.

THE COURT: All right. You may proceed. Mr. Sells, as an officer of the Court -- being an attorney, as an officer of the Court, and that is why I don't swear in attorneys, Ladies and Gentlemen of the Jury. But he's still suppose to tell the truth and the whole truth and nothing but the truth. Go ahead, Mr. Sells.

MR. SELLS: And I'll be testifying in the narrative if I don't have an objection from counsel.

MR. METCALF: No, Your Honor.

THE COURT: Mr. Jenkins, any objection to Mr. Sells testifying in the narrative form?

MR. JENKINS: No, sir.

THE COURT: All right. You may proceed.

CORY SELLS,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

MR. SELL: Bear with me. It's my first time trying this. My name is Cory Sells. I'm associated with the Welscher which law firm. Attorney of record for the plaintiff, Mr. Terry Randall. I was licensed in 2010 -- I'm still kind of green -- by the State Bar of

Texas. And I have been practicing law in the State of Texas for -- you can do the math -- four years -- not hard, yet. I concentrate my practice on representing companies, businessmen, land dealings, and breaches of contract, especially.

I previously represented variety of clients regarding commercial claims, suits by landowners, suits against contractors. And I'm familiar with the fees customarily charged by attorneys in the State of Texas for handling suits on these type of claims.

In connection with the prosecution of this suit, we originally started off with a temporary restraining order to prevent the sale of the vehicle in question. That required us not only to file items quickly, show up, counsel oral hearings. Then we weren't able to achieve service on the individual at his home residence. We had to -- what we thought was his home residence -- we had to then file again to get a motion for substituted service. Which required more work on our parts, and come down again and try to get that resolved.

When no answer was filed timely, we had to do a motion for default judgment as well. Which required more effort on our part. We propounded discovery in this case. When discovery was unanswered,

we had to do a motion to compel, as well. We had to respond to the motions for summary judgment filed by the opposing counsel which required a lot of time on our part. We started off this case with two causes of action, breach of contract and fraud. In preparation for our motion and pleadings --

MR. METCALF: Your Honor, I hate to interrupt the narrative here, but may we all approach, briefly.

THE COURT: Yes, sir.

(Bench Conference off the record)

MR. SELLS: I made my first mistake. I'll do better at this. In these proceedings we've had to propound discovery. We've had to respond when discovery wasn't answered to try to compel a response. We've had to now show up for trial. And in preparation for trial in this matter, on this case, we have worked a total of -- I've worked a total of about one hundred hours of my own time on this. And Mr. Welscher -- I worked at a right of about $200 an hour. Mr. Welscher works at a rate of $300 an hour. He has worked 15.48 hours is what he has down on this one. This isn't including trial. Trial this week I put in another forty hours in preparation and attendance of trial, and includes attendance tomorrow, which I'm guessing we're going to

be here. And that includes an extra eight hours tomorrow. So if you feel we're not going to have to be here, you can subtract that out. And includes an extra ten hours of time for Mr. Welscher of his being here.

Prior to trial the attorney's fees and expenses incurred by our client reached a total of $24,645 for the claim we have today. Of which we're seeking attorney's fees -- we're saying 80 percent of that time spent on this particular cause of action, filings involving this cause of action, preparing the facts on this cause of action, that reduces that 24,000 by the amount of about 4,800. Which would leave, prior to trial and preparation for trial, $19,845 incurred by Mr. Randall in preparation for trial in this matter.

Through trial for today, earlier this week, and Monday, and preparation throughout this week -- preparation for the motion in limine, jury charge, preparation of witness questions, preparing the witnesses in this matter, the total time between me and Mr. Welscher comes out to forty hours of my time at $200 an hour, which is $8,000. And ten hours of Mr. Welscher's time at $300 an hour, which comes out to 3,000, for a total of $11,000.

We are seeking a total of $30,845 in attorney's fees in this matter. We believe that -- or I

believe that is -- in the ranging of reasonableness of attorney's fees you should consider several factors: Skill required to perform the services, the acceptance of employment of the work that was precluded or my firm could not take because we took Mr. Randall's case, the fee customarily charged for the area, the amount involved in the controversy and the results obtain, the experience of the attorneys involved, and the nature and length of the professional agreement -- the professional relationship.

We -- my testimony is that the $30,845 that we're requesting are reasonable and necessary attorney's fees in this matter.

THE COURT: All right.

MR. WELSCHER: How much would or how much --

MR. METCALF: Your Honor, I'm sorry, I've got to object to this. We only have one lawyer at a time.

THE COURT: I'm going to sustain that objection.

MR. SELLS: I'm obviously not done yet.

THE COURT: I allowed you to testify by narrative. He doesn't get to ask you questions. Anything else?

MR. SELLS: We have a contract with

Mr. Randall where he pays our out of pocket expenses plus our hourly rate in this matter. I believe that's all.

THE COURT: All right.

MR. METCALF: I have no questions, Your Honor.

THE COURT: Any questions, Mr. Jenkins?

MR. JENKINS: No, sir.

THE COURT: You may step down. Any further witnesses, Mr. Sells?

MR. SELLS: No further witnesses, Your Honor. But before I -- we rest our case, we'd like to approach.

THE COURT: All right. Why didn't y'all approach.

(Bench Conference off the record)

THE COURT: All right. Ladies and Gentlemen of the Jury, there's a matter I need to take up outside your presence. Please be mindful of my instructions. Do not discuss the case. Do not start deliberating. I will call you back in in a little bit.

All right. Y'all maybe seated.

(Open court, parties present, jury out)

THE COURT: All right. What is it you wanted to present, Mr. Sells?

# REPORTER'S RECORD

## *b.*

## *VOLUME 4*

OFFICIAL REPORTER'S RECORD

VOLUME 4 OF 7 VOLUMES

TRIAL COURT CAUSE NO. 423-2445

APPELLATE CAUSE NO. 03-15-00317-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/13/2015 11:13:24 AM
JEFFREY D. KYLE
Clerk

TERRY RANDALL            *    423RD JUDICIAL DISTRICT COURT

VS.                      *    OF BASTROP

HERBERT J. WALKER, ET AL*    BASTROP COUNTY, TEXAS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

JURY TRIAL

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

On the 16th day of January, 2015 the above entitled and numbered cause came to be heard; and the following proceedings were had before the Honorable Judge Christopher D. Duggan, Judge Presiding, held in Bastrop, Bastrop County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's Record produced by computer-assisted transcription.

MICHELE FRITSCHE, Texas CSR #3964

Official Court Reporter - 423rd Judicial District Court

Bastrop County, Texas

804 Pecan Street

Bastrop, Texas 78602

(512)581-4239

APPEARANCES

ATTORNEY FOR PLAINTIFF
Mr. Steven Cory Sells
Bar Card Number: 24075525
Work Address: 1111 North Loop W Ste 702
Houston, TX 77008-4715
Work Phone Number: 713-862-0800

Mr. Craig Welscher
Bar Card Number: 21167200
Work Address: 1111 North Loop W Ste 702
Houston, TX 77008
Work Phone Number: 713-862-0800


ATTORNEY FOR DEFENDANTS
Mr. Alexander Dale 'Alex' Metcalf
Bar Card Number: 24058000
Work Address: 807 Pecan St
Bastrop, TX 78602-3817
Work Phone Number: 512-303-6963

Mr. William Hartford Jenkins
Bar Card Number: 24012908
Work Address: PO Box 547
908 Chestnut St
Bastrop, TX 78602-3302
Work Phone Number: 512-303-4700

# i.

# OBJECTIONS BY MR. METCALF, ATTORNEY FOR APPELLEES ON SUBMISSION OF JURY QUESTION ONE AND TWO

OFFICIAL REPORTER'S RECORD

VOLUME 4 OF 7 VOLUMES

TRIAL COURT CAUSE NO. 423-2445

APPELLATE CAUSE NO. 03-15-00317-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/13/2015 11:13:24 AM
JEFFREY D. KYLE
Clerk

TERRY RANDALL          *   423RD JUDICIAL DISTRICT COURT

VS.                    *   OF BASTROP

HERBERT J. WALKER, ET AL*  BASTROP COUNTY, TEXAS

*************************************************

JURY TRIAL

*************************************************

     On the 16th day of January, 2015 the above entitled and numbered cause came to be heard; and the following proceedings were had before the Honorable Judge Christopher D. Duggan, Judge Presiding, held in Bastrop, Bastrop County, Texas:

     Proceedings reported by computerized stenotype machine; Reporter's Record produced by computer-assisted transcription.

                MICHELE FRITSCHE, Texas CSR #3964
        Official Court Reporter - 423rd Judicial District Court
                   Bastrop County, Texas
                     804 Pecan Street
                  Bastrop, Texas 78602
                    (512)581-4239

APPEARANCES

ATTORNEY FOR PLAINTIFF
Mr. Steven Cory Sells
Bar Card Number: 24075525
Work Address: 1111 North Loop W Ste 702
Houston, TX 77008-4715
Work Phone Number: 713-862-0800

Mr. Craig Welscher
Bar Card Number: 21167200
Work Address: 1111 North Loop W Ste 702
Houston, TX 77008
Work Phone Number: 713-862-0800


ATTORNEY FOR DEFENDANTS
Mr. Alexander Dale 'Alex' Metcalf
Bar Card Number: 24058000
Work Address: 807 Pecan St
Bastrop, TX 78602-3817
Work Phone Number: 512-303-6963

Mr. William Hartford Jenkins
Bar Card Number: 24012908
Work Address: PO Box 547
908 Chestnut St
Bastrop, TX 78602-3302
Work Phone Number: 512-303-4700

VOLUME 4

## CHRONOLOGICAL INDEX

## JURY TRIAL

**JANUARY 16, 2015**                                    Page   Volume

Objections to Charge heard...................4.....4

Defendant Closes Rests.....................13.....4


Closing Statements by MR. SELLS..........16,40....4

Closing Statements by MR. METCALF..........25.....4

Verdict...................................51.....4

Adjournment...............................58.....4


Court Reporter's Certificate..............59.....4

(Open court, parties present, jury out)

THE COURT: All right. We're on the record, 423-2441. Let the record reflect the plaintiff is present with counsel. Mr. Herbert J. Walker is present with Ms. Walker and counsel.

This Court, yesterday afternoon granting a directed verdict against the defendant, Adam walker. We had an informal charge conference last night until 7:00 p.m., and then we talked and discussed the law of contracts until I had nightmares of John Houseman and the Paper Chase. I loved that movie. Anyway, we now have a draft of the charge. It's my understanding? And we're doing this a little out of order -- but it's my understanding the plaintiff had rested yesterday at 4:30 p.m.

Mr. Metcalf, on behalf of the defendant, Herbert J. Walker, D/B/A Walker Water Well, and Walker Water Well Services, L.L.C. has informed us, before we went on the record, that he plans on resting this morning without calling any witnesses. So that's why we're talking about the charge right now. But we revised this a couple of times -- a few stylistic changes and a few legal changes from the drafts of both the plaintiff's and the defendant's versions of the -- of the draft charge.

So I will ask, first off, on behalf of the plaintiff, Mr. Sells, do you have objections, or requests, or additions, deletions to the charge that we have?

MR. SELLS: No, Your Honor.

THE COURT: All right. Mr. Metcalf, do you have any objections, suggestions, additions, or deletions requested on this charge?

MR. METCALF: We have a couple of objections, Your Honor. First, to question number one, the question regarding the existence of an agreement. We would object. I don't believe there's been sufficient evidence -- actually, I have two objections. My first objection is there's been no evidence. The plaintiff has produced legally insufficient evidence that he had any agreement with the entity Walker Water Well Services, L.L.C., and, therefore, they should not be submitted -- that party should not be submitted. I don't believe there should be a liability question regarding Walker Water Well Services, L.L.C. at all. So on the grounds that the evidence is legally insufficient to submit that party, we would object to question number one.

THE COURT: All right. That's overruled.

MR. METCALF: We also have an objection to

the factual sufficiency of the evidence. I don't believe there has been factually sufficient evidence of a definite agreement, a legally enforceable agreement between the plaintiff and any defendants, specifically Herbert J. Walker and the related entities. As the Court noted in our informal conference yesterday, one of the greatest difficulties in this case is figuring out what even the plaintiff agrees the agreement is. Because he's changed his testimony a number of times on the stand. So we don't believe the plaintiff has met his burden of providing factually sufficient evidence of any agreement between himself and Herbert J. Walker, or any Walker entity. And, therefore, we believe question one should not be submitted at all.

THE COURT: That's Overruled.

MR. METCALF: And, Your Honor, we would also object to question number two. Again, I have two objections. My first objection is to legal sufficiency related to Walker Water Well Services, L.L.C. There's been absolutely no testimony from any party regarding Walker Water Well Services, L.L.C. Therefore, the evidence is, there's no evidence, it is legally insufficient. And question number two should not be submitted including Walker Water Well Service, L.L.C.

THE COURT: All right. That's overruled.

MR. METCALF: And we have a factual sufficiency objection as well. I believe there has been factually insufficient evidence of any breach by Herbert J. Walker of any agreement he had with the plaintiff, since there has been insufficient evidence, then question number two should not be submitted in it's entirety.

THE COURT: That's overruled.

MR. METCALF: As to question number three, Your Honor, my first objection is that themeasure of damages requested in question number three does not track the damages requested in the plaintiff's pleadings. I believe the Court has already looked at the plaintiff's most recent petition, the first amended petition, prior to the start of the testimony in this case. I would remind the Court that the plaintiff specifically pled for damages on breach of contract only for the value of the drilling rig. Which he estimated at $80,000. He never included a request in his pleadings for any sort of benefit of the bargain damages, which is what question three asks about. Since the plaintiff's pleadings will not support question number three, we object to question number three being included.

THE COURT: I'm a little confused on that,

# ii.

# EXCERPTS OF CLOSING STATEMENTS BY MR. METCALF

MR. METCALF: May it please the Court.

THE COURT: Yes, sir.

MR. METCALF: Mr. Randall, why did you sue Adam Walker? Oh, I don't know, Herb told me. No, Mr. Randall, why did you Sue Adam Walker? I guess you'll have to ask my lawyer. Do y'all remember that? Do you remember that testimony yesterday? I guess you'll have to ask my lawyer. My lawyer who's here telling you that it was reasonable and necessary for me to spend $30,000 in attorney's fees instead of buying a $300 sand filter. You'll have to ask my lawyer. Well, Adam Walker is not here now. Tommy Walker is not here now. There are other names that are on there, Walker Water Well Services, L.L.C. Is that a name anybody heard during the trial?

Mr. Sells says, oh, look at Exhibit 2. He didn't get Exhibit 2 out to show you. Nothing on there about an L.L.C. Y'all will have these in the back when you go back there to look at them. One of the kind of strange things about this -- about this case -- there's a D/B/A. I know some of you know what a D/B/A is. And there's an L.L.C. And they're two different things. There's nothing -- there's been no evidence anywhere about an L.L.C. anywhere. When the first time you hear something is when the lawyer talks about it during

closing argument, that should be a giant red flag.

Now, folks, I agree with one thing Mr. Sells told you. And that's the most important thing we're going to look at today is the charge of the court. You've been told over and over again that the Judge decides what the law is. Not Mr. Sells, not me, not Mr. Jenkins. The Judge decides what the law is. And the Judge has decided that for this case, this is the law.

If you will look at the second page of your charge, it concerns me when the person who has the burden of proof -- and you heard the Judge say that a couple times -- even this morning -- the plaintiff has the burden of proof, when the person who has the burden of proof doesn't even mention what his burden is. The Judge told you what his burden is. Look at Number 6. A yes answer must be based on a preponderance of the evidence, unless you're told otherwise. When a question requires an answer other than yes or no, it must be based on the preponderance of the evidence.

What is a preponderance of the evidence? It's the greater weight of credible evidence. You all remember -- I think both lawyers -- maybe all three of us -- told you during voir dire it means more than 50/50. More likely than not. The greater weight of

credible evidence. If you do not find that a preponderance of the evidence -- if you don't find it's more likely than not, supports a yes, then you must answer no. That's the law that Judge gave you.

Let's apply that law to the question you're being asked. Question number one asks you, is Herbert J. Walker a licensed water well driller? No. Does question number one ask you, did Herbert Walker drill three wells? No. Does question one ask you, did Herbert Walker have any agreement with Terry Randall? No. In fact, Herb told you he had agreements with Terry Randall. Hey, folks, that's what Exhibit 2 is all about. Yeah, I came down and tried to show him how to use the rig. He paid me for it. We were all happy. Mr. Randall told you we were all happy. Herb told you we had an agreement. Yeah, they had agreements. They had an agreement before this that Herb was going to help him find a rig. Mr. Randall ends up finding a rig in Ohio. So he didn't buy anything from Mr. Walker. But, yeah, they had agreements. In fact, they even had an agreement that everybody carried out that Herb was going to get his boys to come down and run Mr. Randall's rig for him. You're not asked if they had an agreement. You're not asked did they have an agreement to drill three good water wells. It comes back to that. You'll

have to ask my lawyer.

If all we heard from was Mr. Randall's lawyers, this question might be a little bit different. But thankfully you got to hear from real people and not just lawyers. And the real people told you -- Mr. Randall told you -- what in his mind what the agreement was.

Now, Mr. Sells says, oh, it doesn't say anything -- a meeting of the minds. We all know what the word agreement means. And you can see exactly what Judge Duggan tells you the law in Texas is. You can't consider the unexpressed thoughts or intentions of the party.

If Mr. Randall is thinking I want a chocolate cake, but doesn't tell Herbert Walker that, they don't have an agreement. If Mr. Randall is thinking, I want my wells to go down at least 250 feet, but he doesn't tell Herbert Walker that, they don't have an agreement. If Mr. Randall is thinking, I want Herbert Walker to set all the tanks and the pumps on these wells, and he doesn't tell Herbert Walker that, they don't have an agreement. If Mr. Randall says, I want these wells to produce good water -- which he told you in his mind good means potable -- he told you that -- he wants his wells to have potable water -- have

good water -- and he doesn't tell Herbert Walker that, they don't have an agreement.

I know we've got enough people on this jury who have wells to know that no well man in Texas can ever guarantee good water. Do you really think that it's Herbert Walker's fault that the water underneath Mr. Randall's property has iron in it? Is that Herbert Walker's fault? When Mr. Randall hired somebody else to do this, he told you they had to go down 550 feet to get the kind of water he wants.

This man wants bottled water to come out of his well. And we all do. And if you got enough money. And you can get all the way down to the aquifer, you can get that. If you're trying to get it from a well that's 250 feet deep, you're living in a fairy tale. And if he had told the man who knows something about drilling wells that that's what he wanted, Herb Walker would have told him, we can't do that.

It's a good thing that as jurors you get to rely on your own recollection of the testimony. You don't have to believe what a lawyer tells you the witness said -- this witness said that -- because what Mr. Sells told you this morning, he heard is a heck of a lot different than what I heard. He's telling you he heard Herb say he never had any agreement. That's not

what Herb said.  You heard it.  He said, yes, we had agreements.  He's telling you, Herb said, I don't know anything about that.  Is that what Mr. Walker said?  Remember the testimony.  Use your own recollection of the testimony.  Because I think you'll remember that when Mr. Walker was asked, did you agree -- did you tell them it was going to be bad water?  Did you agree to give them good water?  Herb Walker told him, no, I can't do -- I can't make that kind of agreement.

As a licensed well driller, Mr. Walker told you, I cannot do what Mr. Randall was asking me to do.  If you want to ignore the ground water district, if you want to ignore the Department of Licensing and Regulation, TCEQ, if you want to ignore all the permitting requirements, then you have to use your own rig, you have to hire your own crew, and you have to do it on your own property.  A licensed well driller can't do that for you.

Anybody else here scratching their head about why this old man was dragged all the way down here from Weatherford?  There aren't enough well drillers in and around Bastrop?  In and around Austin?  The Hill Country?  There's a heck of a lot of land.  Heck of a lot of wells being drilled a lot closer to Bastrop than Weatherford.  Why would you have to go all the way up

there to find somebody?

Mr. Randall told you that he had fifteen or twenty wells dug in the past. And when Mr. Randall's hired expert came in and told you about the well that has been dug -- that 550 foot well, do you remember when I asked him, did you talk to -- when you talked to Mr. Odom from Jimmy's Well Service, he told you how much it would cost to drill the three shallow wells that Terry Randall wanted, didn't he? He told you it would cost $22,000.

So the evidence you heard from Mr. Randall's own expert is that if all he wanted were these three shallow wells, he could have gotten that for 22,000 from a licensed driller in Bastrop. Why would he call somebody from Weatherford and offer them $80,000 to do that job? Does that make sense to you?

Mr. Randall filed this lawsuit -- blame it on his lawyers if he wants to -- he filed the lawsuit. Mr. Randall added Tommy Walker and Adam Walker to the lawsuit. He can blame it on his lawyers. He can blame it on Herb Walker. He's the plaintiff. He's the one that when the deal went south, he didn't get what he wanted, he's the one who decided to sue everybody.

Mr. Randall has the burden of proof. He has to prove to you that he had this agreement with these

people. If you go into the back and you believe, well, I think that Terry Randall and Herbert Walker had an agreement, but I don't know about Walker Water Well Services, you have to answer no. If you go into the back and you think, you know, I think Herbert Walker probably did agree to drill a well for him. Maybe drill three wells for him. But I don't think he agreed to drill it to 250 feet. You have to answer no. And when you're trying to figure out -- I don't mean to offend anybody here -- but when I was talking about this case and what this case is about, I kind of jokingly said, you've got two old men who had a phone call four years ago and now they can't agree what they talked about. And, folks, not to make light of it, but that's what this is. These gentlemen talked on the phone a number of times in the fall and winter of 2011 into the beginning of 2012, and now they can't agree on what they talked about.

It's this man -- it's Terry Randall who has to prove to you that this is what they discussed. That they discussed 250 feet. And you don't have to just base it on what people on the stand are telling you. What you base it on is what they said and did, in light of the surrounding circumstances. Oh, yeah, we agreed -- our agreement was 250 feet. But when I came

out, the first well was only 110 feet.  I didn't complain.  You got less than half of what you asked for, but you're telling us that was your agreement all along was 250?

Our agreement was three wells with good water -- with potable water.  But I signed over that drilling rig -- I handed over the paperwork on my, 90,000/$80,000 drilling rig before I ever saw a drop of clean water come out of any one of these three wells.

That was your agreement?  Or what you did in light of the circumstances.  Was your agreement maybe that he drilled three wells and you were going to have to deal with --  you were going to have to get that $300 sand filter.  You were going to have get one of those aeration chambers.  His expert told you there's lots of ways to fix this.  It might get expensive, but there's lots of ways to fix it.  What did these folks do?  After Mr. Randall gave the rig over in January of 2012, what did he do?  Did he call a week later and say I want my money back?  No, he went and bought more materials.  Did he call the State and in February and say, this clown's got a license and he screwed me over?  No.

You heard from the expert -- the hired expert -- he never called and complained at all.  They got referred the issue because of these mistakenly filed

well reports. And that was in October of 2012. He never called and asked for his money back. He never called and complained to anybody.

He hires another company not to fix these three wells, but to drill a 550 foot well. Double what he says he agreed to. What he said and did in light of the surrounding circumstances. What this man said and did proves to you that he never had an agreement with Herbert J. Walker or Walker Water Well Services, L.L.C. to drill three wells to a depth of 250 feet -- to do that using his drilling rig. To set the tanks and pumps on those wells. And that those wells -- part of the agreement that those wells would produce good water. They never had that agreement.

Not only is there not a preponderance of the evidence, I don't think there's a lick of evidence that this was the agreement. And this is what this Judge tells you the law is. I think you have to answer question number one no. And as you can see from all the other questions, once you answer it no, I don't think you're even going to consider the rest of them. But if you do, if you do consider them, folks, think some more about what Terry Randall told you.

His lawyer tells you they failed -- that Herbert Walker and Walker Water Wells Service, L.L.C.

failed to comply with the agreement. Well, if they failed to comply, then why did you sign the rig over? If he failed to comply, why did you wait a year to take any sort of action at all to get your money back? If they failed to comply, why did you keep calling him and following his recommendations and doing what he suggested to you? If they failed to comply, and you got three worthless wells that have a value of zero -- and that's what you've been telling this Court, and in your pleadings, and even telling this jury during the opening statements -- if they're three worthless wells, why are you using one of them for irrigation now? He didn't even tell his expert about that.

He pays that man to come here and tell you these wells are all bad. Really? All three of them? Did you not know that Mr. Randall was using one for irrigation? Oh, no, I didn't know that. Would that surprise you? Well, yeah, I'm surprised. I figured it would burn up. Maybe it's not as bad as he told you it was. Maybe he's not being totally honest with you. Maybe when his lawyer comes in here -- I guess you'll have to ask my lawyer. Maybe when his lawyer comes in here and tells a jury in opening statements you're going to hear that there are three worthless wells that had to be capped -- the truth is he's using one of them to

water his grass to save money right now. You heard that testimony.

If it's so bad, why aren't you using your Aqua Water to water your grass? That's too expense. It's got some value to somebody. That well -- one of those three wells -- it's got some value to somebody. If you believe that there was this agreement -- not an agreement -- but this agreement -- if you believe that there was this agreement, if you believe that Herbert Walker and Walker Water Well Services, L.L.C. breached this agreement, then you're going to be asked about damages.

And, again, listen to what the Judge told you. Did he tell you to consider the value of the drilling rig? Did he tell you to consider the value of the materials that were purchased? Consider the value of the drill bit that this man broke and now wants to make Herb pay for? Did he tell you that? No.

He said, consider only the following element: The difference in the value of the work as agreed to and the value of the work actually performed. What was the value of the work agreed to? According to Mr. Randall, the work that was agreed to was three shallow wells. Three of these alluvial wells. According to Mr. Randall's expert, the value of those

wells would be $22,000. That's what Dave Odom from Tommy's or Jimmy's Well Drilling Service was going to charge. That's what his expert said. Value of the work agreed to is $22,000. What's the value that he got? Well, it was zero. Even though I'm using one of them still to water my lawn. Even though I could use the other ones, if I put a $300 sand filter on it. The value is zero.

If you get to this question, you're not -- there's not a thing on Exhibit 8 that has anything to do with this question. There's not a thing in this question about how much the drill bits cost, how much the stem pipe costs, how much did the drilling rig cost. The only thing that you're entitled to consider to this question is what was the value of the work agreed to. And Mr. Randall's expert told you what the value of that was -- 22,000. And what was the value of what he actually got? He tells you it's zero. We all know that's not true.

Finally, folks, if you answer those other three questions, then you're going to be asked what's a reasonable fee for the necessary services his lawyer provided. His lawyer would tell you it's $30,000. Maybe that's a reasonable fee for what he did in Houston. In Bastrop County, spending $30,000 on a

lawyer instead of $300 on a sand filter, is that reasonable? Is that necessary? Spending $30,000 on a lawyer who's going to bring in other parties who don't even make it to the jury. Is that reasonable? Is that necessary? On a lawyer who's going to tell the jury these three wells are all worthless, when you're using one to irrigate your grass. Is that reasonable and necessary? That's for you to decide. That's for each and every one of you.

You twelve are the reasonable people in Bastrop County who are on this jury. You have to decide what is reasonable. Whether it's reasonable to hire and to spend this kind of money on a lawyer when by his own expert's testimony he could have fixed this with a sand filter and an iron treatment. If you do not find that a preponderance of the evidence supports a yes, then answer no.

Herbert J. Walker testified for a very short time yesterday. I did not put him back on the stand this morning. You all see that Adam Walker never testified. There's been actually very little evidence from that side of the room. Because as I told you in voir dire, and as the Judge told you today, it's not my burden. It's not Herbert J. Walker's burden. He's not the one who brought us all here today. He's not the one

who's asking for a $30,000 check for his lawyer.

The burden is on Terry Randall to prove to you that he made this agreement with Herbert Walker. He did not do that. You have to answer the first question no. And I do not think that we're going to be here very long. Thank you.

THE COURT: Mr. Sells.

MR. SELLS: He testified that his client said on the stand that he told Terry -- he testified in his arguments, did you ever hear this conversation where he said he told Terry Randall he couldn't drill three good water wells? Did you ever hear that over here? Because I'm the only person that asked any questions. I remember about five minutes based on this long drawn out conversation that supposedly came into the record between Mr. Walker and Mr. Randall. I don't remember him responding that way to any of my questions. Nobody else asked him. Why wasn't he brought back up here again if he had more testimony to give?

What I say here you can completely disregard. I'm trying to sum up what was said before. Same thing goes what he said here. You notice I'm the only one who sat in the stand to talk about reasonable attorney's fees. He didn't put himself in there. So does his testimony standing in front of you count for

# REPORTER'S RECORD

## RECORD

*c.*

*VOLUME 7*

OFFICIAL REPORTER'S RECORD

VOLUME 7 OF 7 VOLUMES

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/13/2015 11:13:24 AM
JEFFREY D. KYLE
Clerk

TRIAL COURT CAUSE NO. 423-2445

APPELLATE CAUSE NO. 03-15-00317-CV

TERRY RANDALL                    *    423RD JUDICIAL DISTRICT COURT

VS.                              *    OF BASTROP

HERBERT J. WALKER, ET AL*   BASTROP COUNTY, TEXAS

************************************************************

EXHIBITS

************************************************************

On the 12th, 15th and 16th days of January, 6th day of March, and 21st day April, 2015 the above entitled and numbered cause came to be heard; and the following proceedings were had before the Honorable Judge Christopher D. Duggan, Judge Presiding, held in Bastrop, Bastrop County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's Record produced by computer-assisted transcription.

MICHELE FRITSCHE, Texas CSR #3964

Official Court Reporter - 423rd Judicial District Court

Bastrop County, Texas
804 Pecan Street
Bastrop, Texas 78602
(512)581-4239

APPEARANCES

ATTORNEY FOR PLAINTIFF
Mr. Steven Cory Sells
Bar Card Number: 24075525
Work Address: 1111 North Loop W Ste 702
Houston, TX 77008-4715
Work Phone Number: 713-862-0800

Mr. Craig Welscher
Bar Card Number: 21167200
Work Address: 1111 North Loop W Ste 702
Houston, TX 77008
Work Phone Number: 713-862-0800

ATTORNEY FOR DEFENDANTS
Mr. Alexander Dale 'Alex' Metcalf
Bar Card Number: 24058000
Work Address: 807 Pecan St
Bastrop, TX 78602-3817
Work Phone Number: 512-303-6963

Mr. William Hartford Jenkins
Bar Card Number: 24012908
Work Address: PO Box 547
908 Chestnut St
Bastrop, TX 78602-3302
Work Phone Number: 512-303-4700

# i.

# PLAINTIFFS'
# EXHIBIT 2

ENDORSE HERE

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

↓ Do not endorse or write below this line. ↓

This is a LEGAL COPY of your check. You can use it the same way you would use the original check.

000019970
IRR
201
023
32111

11/17/2011

11/16/2011

**GENERAL PLUMBING CONTRACTORS, INC.**
244 EAST HELMS ROAD
HOUSTON, TX 77037-1602
(281) 820-4747

10650

32-01/1110

DATE *11-13-11*

PAY TO THE ORDER OF *Walker Water Well Service* $ *1205 70/xo*

*Twelve Hundred Five Dollars & 70/xo* DOLLARS

JPMORGAN CHASE BANK, N.A.
HOUSTON REGION
719 MAIN STREET
HOUSTON, TX 77002

VOID AFTER 90 DAYS

FOR



EXHIBIT

# ii.

# PLAINTIFFS' EXHIBIT 4



Fig #1

EXHIBIT
4



FIG #8
WELL #3





FIG #5
WELL #3





FIG 7.
WRI #3





FIG #3



FIG #2

# iii.

# PLAINTIFFS'
# EXHIBIT 8

| Expenses Paid By Mr. Randall (Summary of Plaintiff's Exhibit 3A, 3B, 3C, 3F) | |
|---|---|
| | $44.33 |
| | $189.51 |
| | ▆▆▆▆ |
| | $91.47 |
| | $272.31 |
| | $180.80 |
| | $557.27 |
| | ▆▆▆▆ |
| | $16.86 |
| | $920.95 |
| | $309.85 |
| | $31.83 |
| | $87.47 |
| | $569.50 |
| | $244.54 |
| | $349.11 |
| | $1,166.51 |
| | $138.65 |
| | $2,577.93 |
| | $1250.00 |
| | $76.31 |
| | $38.32 |
| | $482.54 |
| Total of Expense Paid By Mr. Randall (Plaintiff's Exhibit 3) | $ 9,596.06 |
| Value of Drilling Rig Given as Payment | $80,000.00 |
| **Total Damages** | $ 89,596.06 |


PLAINTIFF'S EXHIBIT

# THE WELSCHER LAW FIRM

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

———— ⋆ ————

CRAIG WELSCHER
SHAREHOLDER

1111 North Loop West, Suite 702
Houston, Texas 77008

Tel: (713) 862-0800
Fax: (713) 862-4003

September 29, 2015

*__Via ProDoc Electronic Filing__*
Jeffrey D. Kyle, Clerk
3rd Court of Appeals
P.O. Box 12547
Austin, Texas 78711-2547

> Re: *Court of Appeals Number:03-15-00317-CV*
> *Trial Court Case Number: 423-2441;Terry Randall v. Herbert J. Walker d/b/a*
> *Walker Water Well; and Walker Water Well Services, LLC*

Honorable Clerk:

Enclosed please find following:

• Appellant Brief

Should you have any questions regarding the enclosed, please contact our office. Thank you for your assistance in this matter.

Very truly yours,

THE WELSCHER LAW FIRM

*Connie Gilbert* /e/

Connie Gilbert,
Paralegal to Craig Welscher
service@welscherlaw.com

CCG//pld
Enclosures: As Stated
cc:
*Via Facsimile: (512) 303-6766 and/or*
*__Via Electronic Mail: alex@lostpineslawyer.com__*
Alex Metcalf
Attorney at law
807 Pecan Street
Bastrop, Texas 78602